In December 1993 the Madison County Department of Human Resources filed a petition, seeking temporary custody of H.W. and R.W. The paternal grandparents, L.W. and C.W., filed a motion to intervene, seeking custody of the children. Following oral proceedings, the trial court entered an order, placing temporary custody with the Department and suggesting that the Department initiate proceedings to terminate the parental rights of the children's parents. The grandparents appeal.
The record reflects that the parents of the children were married in 1987 and had three children. At the time of the hearing H.W. was four years old, and R.W. was not yet one year old. The parents' middle child, D.W., died in December 1993. She was 22 months old at the time of her death. The death of the middle child precipitated this action.
An understanding of the facts surrounding the child's death is necessary. According to the mother, the child choked on mashed sweet potatoes and ultimately lost consciousness. She rushed the child to a neighbor's house for assistance. The neighbor attempted unsuccessfully to revive the child. The child was subsequently taken to the hospital and put on a life support system.
Employees of the hospital suspected that child abuse was involved. Authorities were called to investigate. The child was subsequently disconnected from the life support system. Her body was released to the Alabama Department of Forensic Sciences for an autopsy. The autopsy showed that the child sustained contusions on the scalp and forehead, an occipital skull fracture, subdural hemorrhages, and retinal hemorrhages. The autopsy listed the cause of death as blunt force trauma to the child's head. The cause *Page 455 
of death was not found to be from choking or strangulation.
An investigation ensued. Friends and acquaintances of the parents were interviewed. The authorities found sufficient evidence to support the child abuse theory. The children were removed from the parents' home and placed with the Department, pending a more thorough investigation.
The Department subsequently filed a petition, alleging that the children were dependent. Upon a finding of dependency by the trial court, the Department sought temporary legal custody of the children. The paternal grandparents intervened, seeking custody.
All parties agreed that the children were dependent. The issue presented on appeal is whether there was sufficient evidence to support the trial court's denial of the grandparents' petition for custody.
The primary consideration in cases pertaining to custody of a child is what is in the best interests of the child.Shackelford v. State Dep't of Human Resources, 527 So.2d 1329
(Ala.Civ.App. 1988). When determining what would be in the best interests of the child, the court must consider whether an individual seeking custody is physically, financially, and mentally able to care for the child. Shackelford.
The record reflects that the grandparents have been married for 45 years. They have four children. In addition to the 2 grandchildren at issue, the grandparents have 4 other grandchildren, 2 of whom live within 8 miles and the other 2 within 35 miles of the grandparents' residence in Georgia. The evidence reveals that the grandparents maintain a close relationship with their children and grandchildren.
The grandparents have lived in Albany, Georgia, since 1970. They have lived in the same house in an upper middle-class neighborhood for 24 years. Their home contains four bedrooms.
The grandfather is 65 years old. In 1970 he retired as a full colonel from the United States Air Force. Before retiring, he had flown a total of 150 combat missions in Korea and Vietnam and was held for nearly 2 years as a prisoner-of-war during the Korean conflict. He was awarded seven commendation medals, including the Purple Heart. After retiring, he returned to school and earned a degree in accounting. He became employed by a utility commission. At the time of the hearing he was employed as the commission's comptroller. He has been so employed for 20 years. The grandfather's salary, plus his military retirement benefits, exceeds $100,000 annually. The grandfather is actively involved in numerous organizations. He shoots M-1 rifles competitively. There was testimony that he did not have any medical problems and that he was in sound health.
Friends of the father testified that the father had commented on occasion that the grandfather had a drinking problem and that he was a strict disciplinarian. The grandfather testified that he last remembered having a drink with some friends in February 1994. He testified that he liked beer with certain foods. He denied that he had ever had a problem with alcohol. He denied that he was an abusive parent.
The grandmother is also 65 years old. She has been a homemaker for the majority of her married life. While she uses prescription medications to control her non-insulin dependent diabetes, high blood pressure, and arthritis, she testified that these conditions have not prevented her from performing her daily activities. She also has an inactive thyroid, which requires appropriate medication. The grandmother is actively involved in numerous activities. The grandparents had previously kept the two oldest children for several months while the parents sorted through difficulties.
The grandparents testified that they had not discussed the issue of abuse with their son and daughter-in-law because the parents' attorney had cautioned them not to discuss it. The grandparents were aware that the cause of death was a head injury. They believed, however, "that a person is innocent until proven guilty." We are unable to glean from the record whether criminal proceedings had been initiated against the parents at the time of the hearing. *Page 456 
The grandparents testified that they would abide by any requests of the court or the Georgia Department of Human Resources regarding counseling, medical treatment, or other special care for the children. They further testified that they would disallow the parents' visitation with the children if the court so ordered.
The grandparents presented numerous witnesses to vouch for their characters. Witnesses came from Canada, New Mexico, and Albany to give testimony concerning the grandparents. Collectively, the testimony revealed that the grandparents could provide a safe, comfortable, and secure environment for the children.
In March 1994, at the request of the trial court, the Georgia Department of Human Resources performed a home study of the grandparents' home in Albany, Georgia. During this evaluation the agency visited the grandparents' home, interviewed the grandparents, and questioned several people acquainted with the grandparents. Based on the evaluation, the agency made the following recommendation regarding the grandparents' viability as suitable custodians for the children:
 "We highly recommend the placement of [the children] with their grandparents. . . . "The [grandparents] are physically able to care for the children and, financially, [they] have more than enough money to meet their needs. The [grandparents are] highly respected in the community as evidenced by the character references that accompany our evaluation and the children will be surrounded by love and extended family to help supply their emotional and psychological needs."
The trial court denied the grandparents custody, based upon its perception of their health; its perception that the grandparents would not protect the children from their parents; and its perception that the Georgia Department of Human Resources would not properly monitor the case. We find it necessary to set out portions of the trial court's order. They are as follows:
 "The petitions in these cases were filed because of the traumatic death of [D.W.], the sister of [H.W.] and [R.W.], in December of 1993. No purpose would be served in restating the evidence regarding [D.W.'s] death. However, from the evidence presented, the court is clearly convinced that one or both of her parents was an active agent in bringing about [D.W.'s] death.
 "Furthermore, based upon the nature of the injuries which caused [D.W.'s] death, it is far more likely that those injuries were caused by willful acts than by neglect. In addition, there is considerable credible evidence before the court that [the father and the mother] have physically abused their children for virtually their entire lives. This is, of course, a civil case, and the court can consider, and has considered, the fact that [the father and the mother] 'took the Fifth' and refused to testify as to anything of significance in these cases.
 "[The parents] are not seeking to have [H.W. and R.W.] returned to them at this time and are asking that they be placed with the intervenors, . . . the paternal grandparents, who live in Albany, Georgia. It is the court's opinion that [H.W. and R.W.] will and should never, under any circumstances, be returned to their parents or be allowed to be in their company, except under highly supervised conditions. Temporary custody, in these cases, is, therefore, very likely to be, de facto, permanent custody.
 "There are two possible dispositions available to the court in these cases. They are either to place custody with [the paternal grandparents] or [to] place custody with the Madison County Department of Human Resources. The court has carefully evaluated the relative merits of these dispositions in light of what it considers to be the best interest of [H.W. and R.W.].
 "Factors which mitigate in favor of placement with the grandparents are that they are close family members who have interest in and affection for the children, and they have the financial resources to provide for them. In addition, they already know the children, and [H.W.] at least is old enough to know them and feel secure with them. *Page 457 
 "As far as affirmative factors favoring placement of custody with [the Department of Human Resources] are concerned, there really are none. Foster care is an option of last resort, and if there are close, caring relatives able and willing to provide care for children, they should be allowed to do so, unless there are very compelling reasons not to.
 "In this court's mind, then, the question to be decided is: Are there compelling reasons why [the paternal grandparents] should not be granted custody of these two children? Sadly and regretfully, the court finds that there are.
 "[H.W.] is four years old, and [R.W.] is less than a year old. [The paternal grandparents] are each sixty-five years of age. [The paternal grandmother] takes medication for high blood pressure, diabetes, and arthritis, as well as another drug to compensate for the fact that her thyroid gland has been removed surgically. While [the paternal grandfather] claims to be in sound health, his appearance indicates otherwise. Among other things, he appears to be considerably older than his actual age, and, although there was no testimony offered on this point, he appears to have limited use of both his arms.
 "The high degree of probability that [H.W. and R.W.] will not be returned to their parents at any time, coupled with the conditions of the grandparents mentioned above, and the fact that the grandparents failed to suggest any alternative plans for the children should the grandparents become incapacitated, strongly indicates to this court that placing the children with them would not be successful in the long run. The court finds it to be significant that, although [the paternal grandparents] have two adult children who live near them and who frequently visit in their home, neither of them testified in this case or came forward and offered themselves in any way.
 "On the other hand, the court has considered that most foster home placements are not successful. If, therefore, placement in an unrelated foster home is not to be permanent, it could well be in the children's best interests for them to simply be placed with their grandparents initially and hope for the best.
 "However, there is another important consideration, and that is the physical security of the children, i.e., the assurance that their parents will have no access to them. The grandparents, according to them, find it to be 'inconceivable' that the children's parents killed [D.W.]. They apparently believe that she choked on sweet potatoes, as was [the] mother's story before she decided not to testify, even though [D.W.'s] skull was fractured in several places. Given this state of mind on their part, they are, in the judgment of this court, unlikely to take seriously the importance of protecting these children from their parents. They do not believe they need protection.
 "The court realizes that the plan proposed by [the paternal grandparents] includes 'monitoring' by a state social service agency in Albany, Georgia. However, with all due respect to that agency, this court has a very low level of confidence as to the likely extent and quality of that monitoring. The Madison County Department of Human Resources is not even able to monitor placement of all the children who are actually in [its] legal custody. How intensely is an agency in Georgia going to monitor a placement there when the placement is made by a court in Alabama, based on the recommendation of the Georgia agency? Not very, in all likelihood.
 "However, the specifics in this case make it even less likely. The home study prepared in this case by the Georgia agency quotes . . . the grandfather as, in effect, saying, prior to the child's death that the deceased child, due to her clumsiness, ought to have worn a helmet. Then the author of the home study says, 'He had no idea how prophetic his words would be.' The point to be made here is that the agency that would be monitoring the placement and ensuring the safety of the surviving children apparently takes the position that [D.W.'s] death is attributable to her being clumsy or, to use the words of [its] report, to her 'constantly tripping and falling.' There is no way that a person could view the evidence in this case with an open mind and come to that conclusion. *Page 458 
 "It is also interesting to note that [the paternal grandparents] stated to the Georgia social worker that they are willing to work with the agency there and their ill feelings are toward 'the Child Welfare in Alabama.' This court has never hesitated to criticize [the Department of Human Resources] when criticism was believed to be due, but in this instance none is due. Apparently, the author of the Georgia report thinks that this is all just a big misunderstanding and that [the paternal grandparents] are the victims.
 "Under the circumstances, this court has zero confidence that [the paternal grandparents] or the Dougherty County, Georgia, Department of Family and Children's Services would do anything to protect [H.W. and R.W.], because they do not think it is necessary or important for them to do so. In any event, the children being in their custody would present serious risk, but if [the paternal grandparents] were to become disabled or die, that risk would be intolerable.
 "For the reasons stated above, the court hereby places the temporary legal custody of [H.W. and R.W.] with the Madison County Department of Human Resources.
 "It is the opinion of the court that the Madison County Department of Human Resources should initiate action immediately to begin proceedings to terminate parental rights with respect to the parents of [H.W. and R.W.]."
We have carefully studied the evidence in the record, the findings by the trial court, and its judgment.
We have set out pertinent and material portions of that judgment. The judgment sets out factors that mitigate in favor of placing the children with the grandparents. Our review indicates the presence of those factors. There are no affirmative factors favoring placing custody with the Department. We agree with the trial court that placement with the Department, if there are "close, caring relatives able and willing to provide care," should not occur without "compelling reasons."
The trial court then proceeds to relate the compelling reasons which cause it to deny custody of the children to the grandparents, despite the factors in their favor and despite the absence of affirmative factors for giving custody to the Department.
 Those compelling reasons for denying custody to the grandparents are (a) the children are young; (b) the grandparents are old and must take medicine to control diseases common to old people; (c) the grandfather appears (contrary to the medical statements) to be ill and older than his actual age (it is not surprising that a man who has survived 2 wars, flown 150 combat missions, and spent 2 years in a North Korean prison should appear older than he actually is; however, he continues to work every day and fire M-1 army rifles in competition and pursue active social and club activities); (d) the adult children of the grandparents failed to come several hundred miles and testify that they would aid their parents in caring for the children if the grandparents were given custody; (e) the grandparents have not admitted that their son and/or his wife abused and killed the deceased child; (f) if the grandparents were given custody, it would require monitoring of them by the Georgia Department of Human Resources, and the trial court has no belief or confidence that the Georgia agency would do anything to protect the children because they think that the case "is all just a big misunderstanding"; and (g) if the grandparents were to become disabled or die, the Georgia agency would not care for the children and protect them from their parents.
This court understands the desire of the trial court to protect these children from parents it believes responsible for the death of their sibling. However, the concern arises from the trial court's speculation as to what might occur if custody of these children were given to two loving and caring grandparents — grandparents who have assured the trial court that they would protect them in any manner ordered by the court, grandparents who have the capability and funds to rear and cherish them, grandparents who possess all the factors which the trial courts of this state, and this court, always look for in trying to determine the best interests of small children.
The trial court has correctly stated in its judgment that there are no factors favoring *Page 459 
placement of custody of these children with the Department and placing them in foster homes. We agree and feel compelled to reverse the judgment of the trial court because it is contrary to the evidence and, thus, is an abuse of discretion.
Because we do not know the present status of the children, or of the parents, we reverse the judgment and direct the temporary placement of custody of the children with the paternal grandparents, along with the imposition of whatever, if any, safeguards for their protection determined necessary by the trial court, including the assistance of the Georgia Department of Human Resources.
If, as suggested by the trial court, the parental rights of the parents are terminated, there are possible further proceedings for permanent custody and placement.
The foregoing opinion was prepared by Retired Appellate Judge L. CHARLES WRIGHT while serving on active duty status as a judge of this court under the provisions of § 12-18-10(e), Code 1975.
REVERSED AND REMANDED WITH DIRECTIONS.
All the Judges concur.