We granted the petition of the Alabama Department of Human Resources (D.H.R.) for certiorari review, to determine whether the Court of Civil Appeals erred in reversing the trial court's judgment granting custody of two minor children to D.H.R.L.W. v. State Department of Human Resources, 682 So.2d 453
(Ala.Civ.App. 1995). After reviewing the record, we reverse the judgment of the Court of Civil Appeals and render a judgment affirming the judgment of the trial court.
Huntsville residents R.W. and G.W. married in 1987; three children were born to the union. The events that resulted in this case began in December 1993 after the death of the middle child, D.W., when she was 22 months old. The mother told authorities the girl had choked while eating sweet potatoes, but an autopsy indicated that the child's death had resulted from a fractured skull. Authorities investigating the death found evidence to support a finding of child abuse. Subsequently, the surviving children were taken from the home.
D.H.R. pursued temporary legal custody of the two surviving children, H.W. and R.W., who were four years old and 11 months old at the time. The children's paternal grandparents, L.W. and C.W., intervened in the case, seeking custody of the children. The trial court conducted a hearing with regard to custody and determined that the children's interests would be best served by placing them with D.H.R. rather than with the grandparents. The Court of Civil Appeals reversed, holding that the trial court had abused its discretion in reaching its decision.
The dispositive issue is whether the trial court abused its discretion by placing custody of the children with D.H.R. rather than with the paternal grandparents. Appellate review is limited in cases where the evidence is presented to the trial court ore tenus. In a child custody case, an appellate court presumes the trial court's findings to be correct and will not reverse without proof of a clear abuse of discretion or plain error. Reuter v. Neese, 586 So.2d 232 (Ala.Civ.App. 1991);J.S. v. D.S., 586 So.2d 944 (Ala.Civ.App. 1991). This presumption is especially applicable where the evidence is conflicting. Ex Parte P.G.B., 600 So.2d 259, 261 (Ala. 1992). An appellate court will not reverse the trial court's judgment based on the trial court's findings of fact unless the findings are so poorly supported by the evidence as to be plainly and palpably wrong. See Ex Parte Walters, 580 So.2d 1352
(Ala. 1991).
The evidence presented at the custody hearing was conflicting. We must therefore determine whether the trial court's judgment was supported by the evidence. The trial court's order follows in relevant part:
 "The petitions in these cases were filed because of the traumatic death of [D.W.], the sister of [H.W.] and [R.W.], in December of 1993. No purpose would be served in restating the evidence regarding [D.W.'s] death. However, from the evidence presented, the court is clearly convinced that one or both of her parents was an active agent in bringing about [D.W.'s] death.
 "Furthermore, based upon the nature of the injuries which caused [D.W.'s] death, it is far more likely that those injuries were caused by willful acts than by neglect. In addition, there is considerable credible evidence before the court that [the father and the mother] have physically abused their children for virtually their entire lives. This is, of course, a civil case, and the court can consider, and has considered, the fact that [the father and the mother] 'took the Fifth' and refused to testify as to anything of significance in these cases.
 "[The parents] are not seeking to have [H.W. and R.W.] returned to them at this time and are asking that they be placed with the intervenors, . . . the paternal grandparents, who live in Albany, Georgia. It is the court's opinion that [H.W. and R.W.] will and should never, under any circumstances, be returned to their parents or be allowed to be in their company, except under highly supervised conditions. Temporary custody, in these cases, is, therefore, very likely to be, de facto, permanent custody. *Page 461 
 "There are two possible dispositions available to the court in these cases. They are either to place custody with [the paternal grandparents] or [to] place custody with the Madison County Department of Human Resources. The court has carefully evaluated the relative merits of these dispositions in light of what it considers to be the best interest of [H.W. and R.W.].
 "Factors . . . in favor of placement with the grandparents are that they are close family members who have interest in and affection for the children, and they have the financial resources to provide for them. In addition, they already know the children, and [H.W.] at least is old enough to know them and feel secure with them.
 "As far as affirmative factors favoring placement of custody with [the Department of Human Resources] are concerned, there really are none. Foster care is an option of last resort, and if there are close, caring relatives able and willing to provide care for children, they should be allowed to do so, unless there are very compelling reasons not to.
 "In this court's mind, then, the question to be decided is: Are there compelling reasons why [the paternal grandparents] should not be granted custody of these two children? Sadly and regretfully, the court finds that there are.
 "[H.W.] is four years old, and [R.W.] is less than a year old. [The paternal grandparents] are each sixty-five years of age. [The paternal grandmother] takes medication for high blood pressure, diabetes, and arthritis, as well as another drug to compensate for the fact that her thyroid gland has been removed surgically. While [the paternal grandfather] claims to be in sound health, his appearance indicates otherwise. Among other things, he appears to be considerably older than his actual age, and, although there was no testimony offered on this point, he appears to have limited use of both his arms.
 "The high degree of probability that [H.W. and R.W.] will not be returned to their parents at any time, coupled with the conditions of the grandparents mentioned above, and the fact that the grandparents failed to suggest any alternative plans for the children should the grandparents become incapacitated, strongly indicates to this court that placing the children with them would not be successful in the long run. The court finds it to be significant that, although [the paternal grandparents] have two adult children who live near them and who frequently visit in their home, neither of them testified in this case or came forward and offered themselves in any way.
 "On the other hand, the court has considered that most foster home placements are not successful. If, therefore, placement in an unrelated foster home is not to be permanent, it could well be in the children's best interests for them to simply be placed with their grandparents initially and hope for the best.
 "However, there is another important consideration, and that is the physical security of the children, i.e., the assurance that their parents will have no access to them. The grandparents, according to them, find it to be 'inconceivable' that the children's parents killed [D.W.]. They apparently believe that she choked on sweet potatoes, as was [the] mother's story before she decided not to testify, even though [D.W.'s] skull was fractured in several places. Given this state of mind on their part, they are, in the judgment of this court, unlikely to take seriously the importance of protecting these children from their parents. They do not believe they need protection.
 "The court realizes that the plan proposed by [the paternal grandparents] includes 'monitoring' by a state social service agency in Albany, Georgia. However, with all due respect to that agency, this court has a very low level of confidence as to the likely extent and quality of that monitoring. The Madison County Department of Human Resources is not even able to monitor placement of all the children who are actually in [its] legal custody. How intensely is an agency in Georgia going to monitor a placement there when the placement is made by a court in Alabama, based *Page 462 
on the recommendation of the Georgia agency? Not very, in all likelihood.
 "However, the specifics in this case make it even less likely. The home study prepared in this case by the Georgia agency quotes . . . the grandfather as, in effect, saying, prior to the child's death that the deceased child, due to her clumsiness, ought to have worn a helmet. Then the author of the home study says, 'He had no idea how prophetic his words would be.' The point to be made here is that the agency that would be monitoring the placement and ensuring the safety of the surviving children apparently takes the position that [D.W.'s] death is attributable to her being clumsy or, to use the words of [its] report, to her 'constantly tripping and falling.' There is no way that a person could view the evidence in this case with an open mind and come to that conclusion.
 "It is also interesting to note that [the paternal grandparents] stated to the Georgia social worker that they are willing to work with the agency there and their ill feelings are toward 'the Child Welfare in Alabama.' This court has never hesitated to criticize [the 'Department of Human Resources'] when criticism was believed to be due, but in this instance none is due. Apparently, the author of the Georgia report thinks that this is all just a big misunderstanding and that [the paternal grandparents] are the victims.
 "Under the circumstances, this court has zero confidence that [the paternal grandparents] or the Dougherty County, Georgia, Department of Family and Children's Services would do anything to protect [H.W. and R.W.], because they do not think it is necessary or important for them to do so. In any event, the children being in their custody would present serious risk, but if [the paternal grandparents] were to become disabled or die, that risk would be intolerable.
 "For the reasons stated above, the court hereby places the temporary legal custody of [H.W. and R.W.] with the Madison County Department of Human Resources."
The Court of Civil Appeals agreed with the trial court's feeling that D.H.R. should not be awarded custody of the children when there are close, caring relatives able and willing to provide care, unless there are compelling reasons, but it determined that the best interests of the children were not being served by placing custody with D.H.R., given the grandparents' physical, financial, and mental ability to care for them. We have reviewed the record and determine that the trial court was not plainly or palpably wrong in awarding custody to D.H.R. While there was no dispute that the grandparents were financially able to care for the children, the testimony regarding their physical and mental ability to care for the children was conflicting.
The grandparents testified that they were in good health and believed they could take care of the children, although there was evidence, as set forth in the trial court's order, regarding medications being taken by the grandmother and regarding the grandfather's physical condition. The grandfather works and is away from the home approximately 10 hours per day; this fact means that the grandmother would face the challenge of handling the children each day alone. More than one witness testified that before D.W.'s death, the grandparents had kept H.W. and D.W. for an extended period. The witnesses were told that the grandparents were keeping the children to give the parents a break, but, in fact, the mother had been arrested for writing bad checks. After several months, according to the testimony, the parents told the witnesses the grandmother had called and asked that the parents come and pick up the children because she could not handle them. The grandparents did not present to the court any plan to employ household help or other assistance in handling the children. The grandparents have two grown children who live within 30 minutes' travel of their home. These children neither came to court nor sent to the court any evidence of a willingness to support their parents' efforts to gain custody of and to help care for their nieces. In light of this fact, the trial court could have reasonably found that the grandparents would be taking care of the children on their own and that doing so would be more than they could handle. *Page 463 
There was other conflicting testimony. Several witnesses testified that the father of H.W. and R.W. told them that the childrens' paternal grandfather had abused alcohol and had been physically abusive to him and his brother. The grandfather denied drinking more than occasionally; he described his use of physical discipline as a "last resort" method that involved a "swat" to get the child's attention. The father of the children denied that he had ever said anything resembling what the witnesses testified he had said about his father.
Clinical child psychologist Dr. Patti Van Eys testified that H.W. showed no delight in seeing her family during visits with them after she was removed from her parents' home; that she had no problem parting company with them; that she initiated the departure; and that H.W. did not interact with her grandparents unless they initiated the contact. Dr. Van Eys described the grandparents as not demonstrating much warmth. She testified that H.W.'s lack of attachment to family members was underscored by her decision to sit with Dr. Van Eys after only a brief interaction with her mother and the grandparents and to seek her help in opening gifts from her grandmother. H.W. did this despite having met with Dr. Van Eys on only three prior occasions.
In addition, Dr. Van Eys testified that H.W. began calling the foster parents with whom she and her sister lived "mommy" and "daddy" immediately upon her placement with them. Within a matter of weeks, she progressed from the withdrawn, timid personality she had initially displayed to being a more active and vibrant child. The trial court could reasonably have found from this evidence that H.W. had adjusted well and had found a caring and nurturing environment.
The trial court in its order expressed concern for the physical security of the children if the natural parents had access to the children. This concern is certainly reasonable, given the evidence that the deceased child had suffered several skull fractures and given the mother's initial story that the child had choked on sweet potatoes. While the grandparents indicated they would cooperate with the court to the extent of not allowing the parents to visit with the children, the trial court expressed reservation. We can not say, given the circumstances of the death of D.W. and given the testimony of the grandparents, that this concern was unfounded. Although no one rebutted the grandparents' testimony that they would cooperate, the other evidence made it reasonable for the trial court to conclude that a conflict existed.
This evidence is sufficient to support the trial court's findings in this case. While the trial court's reservations about the ability of the Georgia Department of Family and Children's Services to monitor the grandparents and protect the children from their parents are speculative to some degree, the testimony, taken as a whole, sustains the trial court's judgment. The judgment of the Court of Civil Appeals is therefore reversed, and a judgment is rendered affirming the judgment of the trial court.
REVERSED AND JUDGMENT RENDERED.
HOOPER, C.J., and MADDOX, SHORES, HOUSTON, KENNEDY, and INGRAM, JJ., concur.
BUTTS, J., dissents.