The Madison Juvenile Court entered an order terminating the parental rights of N.F., the mother, after finding that the children's maternal grandmother was not a viable alternative to termination. We granted certiorari review to determine whether the Court of Civil Appeals erred in reversing that order. We reverse the judgment of the Court of Civil Appeals and render a judgment affirming the judgment of the trial court.
 Facts and Procedural History
In August 1996, the Madison County Department of Human Resources ("DHR") received a report that two minor children, W.R.F. IV and S.F., were being inadequately supervised. After it received an additional report in December 1997, DHR reached an agreement with the mother and placed the children with J.P. ("the maternal grandmother"). In February 1998, the maternal grandmother notified DHR that she could no longer care for the children because she was getting married and her husband-to-be did not want the children living with them. Without DHR's consent, J.P. physically placed the children in the home of a married couple she knew.
The children continued to live with the married couple until May 2000, when the couple began having marital problems and requested that the children be moved. At that time, DHR asked the maternal grandmother if she would again take custody of the children. At the termination hearing, the maternal grandmother testified that she declined custody at that time because her husband was terminally ill and all of her attention was focused on him. However, the social worker testified that the maternal grandmother told her that she was declining custody because her husband was very much opposed to the children's being placed with them. Although DHR then evaluated the maternal great-grandparents as a suitable alternative to terminating the mother's parental rights, DHR determined that the great-grandparents were elderly, that they had a limited support system available to them, and that *Page 119 
they had not had any contact with the children or the mother for a number of years.
In May 2000, DHR petitioned to terminate the parental rights of the mother and W.R.F. III (the father). Shortly before the scheduled termination hearing, the maternal grandmother petitioned to intervene in the action, claiming that she could now accept custody of the children because her husband had died.
At the termination hearing, the maternal grandmother testified that she could now devote sufficient time to the children because she no longer had to care for her husband. The maternal grandmother also testified that she lived in a four-bedroom home that would be paid off by mortgage insurance she had had on her husband's life and that each child would have his own bedroom. If the children were allowed to live with her, the maternal grandmother stated, they would be able to attend a good school that is located less than two miles from her home. Because the maternal grandmother works, the children would have to attend after-school care. She testified that she works as a hairdresser and that her schedule is flexible, so the children would have to be in after-school care for only approximately one hour each day. Finally, the maternal grandmother testified that she would have the means to support the children because she earns approximately $35,000 per year and she will be receiving $175,000 as the beneficiary of a life insurance policy on her deceased husband's life.
Following the hearing, the trial court terminated the mother's parental rights, stating:
 "The court heard testimony from several maternal relatives seeking to obtain custody of the children. In that regard, the maternal grandmother . . . was allowed to intervene. [The maternal grandmother] had accepted physical custody of the children when they were removed from the mother's care in late 1998.[1] Without the consent of [DHR], she physically placed the children in the home of an acquaintance. . . . [DHR] eventually licensed this home for foster care, and allowed the children to remain. The grandmother explained to the Department that she was about to get married and could not care for the children any longer.
 "Unfortunately, in March of 1998,[2] the [married couple] divorced and returned custody of the children to [DHR]. Once again, the maternal grandmother was consulted about placement. Despite abundant evidence to the contrary, the maternal grandmother claimed that she did not take custody of the children at this point because she had decided that her daughter might not work as hard to regain custody if she, a relative, took them back into her custody. This interpretation flies in the face of the facts and the best interest of the children. Clearly, the maternal grandmother was trying to twist her failure to take custody into some gesture that might seem positive to this court, instead of negative. The court is not persuaded by this argument.
 "Instead, the maternal grandmother appears to have failed her own children and her grandchildren. Her decisions *Page 120 
 are consistently made for her own selfish interest. She left the state of Kansas and left her daughter in foster care over a matter that appeared to involve her daughter staying out later than she was allowed. The grandmother admitted that she did not raise her own children and thus their drug problems and emotional problems were not her fault. She admitted that [the mother] was either in [the] custody of her father or in foster care for the majority of her life. As well articulated in the opinion of the guardian to the court, dated September 14, 2000,
 "`. . . She must have understood that moving to another state would greatly hinder any effort of hers to regain her daughter's custody. I think it reasonable to conclude that she [the maternal grandmother] had other priorities in her life at that time.'
 "The court agrees with the guardian and states [that] the evidence shows that [the maternal grandmother] has always had other priorities. [The maternal grandmother] has demonstrated a lack of appreciation for the negatives that would occur to the children in moving them from location to location. She is seemingly unaware of the need that children have for the security found in the same house setting with the same parental figure with [a] consistent routine established. She failed to provide that security for her own children and she has exhibited a history of failing to provide that security for her grandchildren. The court finds by clear and convincing evidence that it is not in the best interest for these children to be placed in the custody of this grandmother.
". . . .
 "These children deserve to have their best interest served in making a determination as to their long-term placement or right to permanency. The relatives have been considered by the court and based on the matters as set out above and all the evidence presented, the court finds by clear and convincing evidence that the placement of the children with any of the relatives would not serve their long-term best interest."
The mother and maternal grandmother appealed to the Court of Civil Appeals; that court reversed the trial court's judgment terminating the mother's parental rights and remanded the case to the trial court "to consider the maternal grandmother's present ability to care for the children in evaluating whether her having custody is a viable alternative to terminating the mother's parental rights." J.P. v. State Dep't ofHuman Res., 834 So.2d 111 (Ala.Civ.App. 2001).
DHR petitioned this Court for a writ of certiorari, arguing that the Court of Civil Appeals "substituted [its] opinion for that of the trial court regarding the weight and credibility of the maternal grandmother's testimony about her current situation, as well as her ability to provide these children a permanent, and, therefore, viable placement alternative."
 Analysis
Because this case concerns an issue of child custody, this Court presumes that the trial court's findings are correct, and we will not reverse its judgment absent a clear abuse of discretion or plain error. See Ex parte Alabama Dep't of Human Res., 682 So.2d 459, 460 (Ala. 1996).
 "This presumption [of correctness] is especially applicable where the evidence is conflicting. Ex parte P.G.B., 600 So.2d 259, 261 (Ala. 1992). An appellate court will not reverse the trial court's judgment based on the trial court's findings of fact unless the findings are so poorly supported by the evidence as to be *Page 121 
 plainly and palpably wrong. See Ex parte Walters, 580 So.2d 1352 (Ala. 1991)."
Ex parte Alabama Dep't of Human Res., 682 So.2d at 460.
In its opinion, the Court of Civil Appeals stated:
 "Both of DHR's concerns regarding the maternal grandmother's ability to be a custodian and an alternative to termination of the mother's parental rights address the past conditions and past ability of the maternal grandmother to be a custodian. As stated above, the evidence regarding the maternal grandmother's parenting involves events that occurred more than 10 years in the past. Moreover, the evidence, as shown above, demonstrates the maternal grandmother's present ability to be a custodian of the children."
J.P. v. State Dep't of Human Res., 834 So.2d at 114. Based on its opinion in V.M. v. State Department of Human Resources, 710 So.2d 915
(Ala.Civ.App. 1998), the Court of Civil Appeals reversed the trial court's order terminating the mother's parental rights.
In V.M., the Court of Civil Appeals determined that a mother, who had previously experienced bouts of drug and alcohol addiction, had met almost all of the goals DHR had set for her, and it reversed a trial court's order terminating her parental rights. In addition, the Court of Civil Appeals reversed the trial court's finding that the maternal grandmother was not a viable alternative to termination of the mother's parental rights. The Court of Civil Appeals stated:
 "The record clearly indicated that the maternal grandmother was interested in being considered as a relative resource and that she had expressed that interest to DHR beginning in 1995. Despite that potential resource, however, DHR had not performed a home evaluation or otherwise investigated the grandmother. DHR's dismissal of the grandmother appears to be based, in large part, on her refusal to take the children in late 1993. The DHR representative also testified that the grandmother had shown a lack of initiative in contacting DHR regarding the necessary paperwork, that she would be working during much of the time that the children were home from school, and that a placement of an older grandchild had not been successful. All of DHR's objections to the grandmother as a relative resource were based on past history, however, and there was no evidence that she had been considered in light of her present circumstances, her present willingness to be a resource for the children, and the present improvement in the mother's condition. DHR must present `evidence of recent attempts to locate viable alternatives in order to establish that termination of parental rights is the least drastic alternative.' Bowman [v. State Dep't of Human Res., 534 So.2d 304, 306 (Ala.Civ.App. 1988)](emphasis added)."
710 So.2d at 921.
Although the main opinion of the Court of Civil Appeals in the instant case quotes the above-quoted language from V.M., Judge Thompson, joined by Judge Pittman, dissented, noting:
 "In this case, DHR attempted to investigate the maternal grandmother's home, but she informed the social worker that she would not take the children. She expressed no interest in obtaining custody of the children until the eleventh hour before the termination hearing. . . . The trial court did not believe the grandmother was sincere in explaining her refusal to take the children, or, apparently, in testifying that she was, as *Page 122 
 of that date, in a position to, and was willing to, take care of the children.
 ". . . [A]t no time has this maternal grandmother chosen the best interests of the children over her own needs or desires.
"`. . . .'
 ". . . [T]here is no evidence in the record to indicate that the maternal grandmother's conduct up until a few days before the termination hearing was not a reliable indicator of her present willingness to take the children, or her probable future actions with regard to the children. DHR presented ample evidence to establish the grandmother's consistent unwillingness, and, therefore, her unsuitability, to be considered a custodian of the children."
834 So.2d at 117 (Thompson, J., dissenting). Having reviewed the record, we agree with Judge Thompson's conclusion that the facts here are distinguishable from those presented to the Court of Civil Appeals inV.M. Most notably, the maternal grandmother's continued rejection of the children until the death of her husband was a strong indicator of whether she had a present desire to care for these children as late as 10 days before the termination hearing.
The trial court's judgment in this case was based on ore tenus evidence. Moreover, the trial court's determination as to the maternal grandmother's ability to care for the children was based, at least in part, upon the maternal grandmother's often conflicting testimony. Thus, the Court of Civil Appeals was required to apply a presumption of correctness to the trial court's finding that placement of the children with the maternal grandmother was not a suitable alternative to termination. Applying that same presumption to the record now before us, we cannot say that the trial court's conclusion that the maternal grandmother provided no suitable alternative to termination constituted an abuse of discretion or that it was plainly and palpably wrong. Therefore, we reverse the decision of the Court of Civil Appeals and render a judgment affirming the judgment of the trial court.
REVERSED AND JUDGMENT RENDERED.
Houston, See, Lyons, Harwood, Woodall, and Stuart, JJ., concur.
Moore, C.J., and Johnstone, J., dissent.
[1] The record reflects that the children were placed with the maternal grandmother in December 1997.
[2] Although the trial court states that the married couple began having problems in March 1998, the record reflects that the children remained with the married couple until they started experiencing marital difficulties in May 2000.