12 So.3d 123 (2008)
B.L.T.
v.
V.T. and D.T.
2070918.
Court of Civil Appeals of Alabama.
December 31, 2008.
Joshua J. Lane, Anniston, for appellant.
Valerie L. Goudie, Anniston, for appellees.
*124 THOMAS, Judge.
In November 2006, the Calhoun Juvenile Court determined that D.C.T. (hereinafter sometimes referred to as "the child" or "the older child") was dependent and awarded her custody to the Calhoun County Department of Human Resources ("DHR"). The child was placed with V.T. and D.T. ("the paternal grandparents") while DHR worked to reunify B.L.T. ("the mother") with the child. On March 1, 2007, the paternal grandparents moved to intervene in the dependency proceeding and sought custody of the child. The juvenile court granted the petition to intervene, directed DHR to conduct a home study and a background check on the paternal grandparents, and set the matter for a hearing. Following the hearing on February 8, 2008, the juvenile court, on February 11, 2008, transferred custody of the child to the paternal grandparents, reserved the issue of visitation between the mother and the child, and directed the parties to submit a visitation plan to the court by May 8, 2008. On February 21, 2008, the mother appealed to this court from the juvenile court's February 11, 2008, order. This court determined that the mother's appeal was not from a final judgment because the visitation issue remained pending before the juvenile court; therefore, we dismissed the mother's appeal on March 25, 2008.
On April 10, 2008, the mother moved the juvenile court to establish her rights to visitation with the child. On June 5, 2008, the juvenile court entered a judgment setting out a schedule of visitation between the mother and the child. On June 10, 2008, the paternal grandparents filed a postjudgment motion, seeking to have the juvenile court vacate its June 5, 2008, judgment. On June 16, 2008, the juvenile court set the paternal grandparents' postjudgment motion for a hearing on June 18, 2008. On July 7, 2008, the mother filed a notice of appeal indicating that she was appealing from a final judgment of June 5, 2008, transferring custody of the child to the paternal grandparents. On July 8, 2008, the juvenile court purported to amend its June 5, 2008, judgment in response to the paternal grandparents' postjudgment motion.
Pursuant to Rule 1(B), Ala. R. Juv. P., "[a] postjudgment motion is deemed denied if not ruled on [by the juvenile court] within 14 days of filing." The paternal grandparents' June 10, 2008, postjudgment motion was denied by operation of law on June 24, 2008, 14 days after it was filed, because the juvenile court had not expressly ruled on it; therefore, the juvenile court's July 8, 2008, order purporting to amend its June 5, 2008, judgment was a nullity. The mother's July 7, 2008, notice of appeal, which was filed within 14 days of the denial by operation of law of the paternal grandparents' postjudgment motion, was timely.

Standard of Review
Section 12-15-71, Ala.Code 1975, provides, in pertinent part:
"(a) If a child is found to be dependent, the court may make any of the following orders of disposition to protect the welfare of the child:
"(1) Permit the child to remain with the parents, guardian, or other custodian of the child, subject to conditions and limitations as the court may prescribe.
"(2) Place the child under protective supervision as herein provided or under the supervision of the Department of Human Resources.
"(3) Transfer legal custody to any of the following:

*125 "a. The Department of Human Resources; provided, that the department is equipped to care for the child.
"b. A local public child-placing agency or private organization or facility willing and able to assume the education, care, and maintenance of the child and which is licensed by the Department of Human Resources or otherwise authorized by law to receive and provide care for the child.
"c. A relative or other individual who, after study by the Department of Human Resources, is found by the court to be qualified to receive and care for the child.

"(4) Make any other order as the court in its discretion shall deem to be for the welfare and best interests of the child."
(Emphasis added.) The legal standard to be applied in the dispositional phase of a dependency proceeding is the best-interest standard. S.P. v. E.T., 957 So.2d 1127 (Ala.Civ.App.2005).
"In Ex parte Alabama Department of Human Resources, 682 So.2d 459 (Ala. 1996), the Alabama Supreme Court stated the applicable principles of appellate review in the context of a challenge to a juvenile court's custodial disposition of a dependent child:
"`Appellate review is limited in cases where the evidence is presented to the trial court ore tenus. In a child custody case, an appellate court presumes the trial court's findings to be correct and will not reverse without proof of a clear abuse of discretion or plain error. Reuter v. Neese, 586 So.2d 232 (Ala.Civ.App.1991); J.S. v. D.S., 586 So.2d 944 (Ala.Civ.App.1991). This presumption is especially applicable where the evidence is conflicting. Ex Parte P.G.B., 600 So.2d 259, 261 (Ala. 1992). An appellate court will not reverse the trial court's judgment based on the trial court's findings of fact unless the findings are so poorly supported by the evidence as to be plainly and palpably wrong. See Ex Parte Walters, 580 So.2d 1352 (Ala. 1991).'
"682 So.2d at 460."
J.J. v. J.H.W., [Ms. 2061197, October 10, 2008] ___ So.3d ___, ___ (Ala.Civ.App. 2008).
The record reveals that the mother gave birth to the child, a daughter, in 2005. The mother and her husband, the child's father, separated when the child was approximately six weeks old. Initially, the child's father had custody of the child; the father and the child lived in the paternal grandparents' home. The paternal grandmother was the child's primary caretaker while her son, the child's father, worked the third shift at night and slept during the day. The mother had visitation for two hours each week with the child. The record indicates that, shortly after the parents separated, a representative of DHR came to the paternal grandparents' home and performed a drug test on the father and both paternal grandparents. The paternal grandfather tested positive for marijuana. The child's father also tested positive on the drug test, but the record does not indicate for what substance the father's drug test was positive. Apparently the child's father moved out of the paternal grandparents' home soon after the drug tests were performed. The record contains no further mention of the father, and he did not appear at the dependency hearing.
DHR began offering the paternal grandfather drug counseling and drug-testing services in an effort to maintain the child's placement with the paternal grandparents. DHR also began providing the mother with services in March 2006 after the paternal *126 grandparents notified DHR that they were concerned about the mother's ability to parent the child. DHR's involvement with the mother centered on teaching her parenting skills, providing her with counseling services, and formulating a safety plan in order to avoid exposing the child to either H.D., the mother's brother who had sexually abused the mother as a child, or C.C., the father of the mother's younger child, T.D., also a daughter. C.C. is a convicted sex offender who sodomized his two-year-old niece. The mother and C.C. separated, and T.D. was removed from their custody, after an incident of domestic violence between them. The record indicates that, immediately before the trial of this case, DHR had filed a dependency petition with respect to T.D. and the mother had stipulated that T.D. was dependent.
DHR social worker Christina Kilgroe testified that the mother, who has an I.Q. of 62, has a low level of cognitive functioning that causes her to become easily frustrated, withdrawn, short-tempered, and petulant. Both Kilgroe and her successor, social worker Vacretta Smith, who became the mother's caseworker in December 2007, as well as Priscilla Ashford, a family-services worker at Covenant Services, testified about incidents in which the mother had "pitched a fit" or cursed at the service providers in the presence of the child when the providers refused to accede to the mother's demands. In addition, Keith Bergstresser, a family counselor at Youth Villages who had worked with the mother on anger-management skills, relaxation techniques, and communication skills since May 2007, testified that the mother locked him out of her mobile home when she became frustrated with his answer to a question.
Kilgroe testified that, when she first began working with the mother, it was apparent that the mother had not bonded with D.C.T., her older child, and that she clearly favored T.D., her younger child. Kilgroe described an elaborate and expensive party that the mother had planned for T.D.'s first birthday and contrasted it with the mother's forgetting to bring the older child a present or a card on that child's birthday. Both Kilgroe and Smith acknowledged that, by the time of trial, the mother had made progress in learning how to interact with and be attentive to the older child. Kilgroe acknowledged that the mother had also made progress in developing independent-living skills by obtaining a driver's license and a vehicle and by maintaining employment for two years. The mother worked the third, late-night shift at a McDonald's fast-food restaurant. Kilgroe had reservations, however, about returning the child to the mother's custody because the mother relied upon and spent time in the home of her parents, who had been the subject of child-abuse-and-neglect reports during the mother's own childhood, and because the mother still had a relationship with her brother, who had sexually abused her as a child.
Katrina Cook, a family-support worker at Covenant Services, testified that she had been supervising visits between the mother and both children since November 2007. She stated that, although the mother had improved in her attentiveness to the older child, she believed that the mother still had a stronger bond with the younger child and she did not think the mother was ready to parent her children without assistance from DHR. She described an incident during which the mother had pouted or cried when she didn't "get her way" at an individualized service plan ("ISP") meeting.
All the social workers and service providers agreed that the child was strongly bonded to the paternal grandparents. *127 They testified that the child looked forward to the end of her visits with the mother so that she could return to the home of "Nana," the paternal grandmother. The guardian ad litem recommended that the paternal grandparents be given custody of the child.
The paternal grandmother testified that she was seeking custody of the child because she loved the child. She explained that she had been the child's primary caretaker since the child was six weeks old. The paternal grandmother stated that she and her husband both work full-time. She takes the child to a day-care facility on her way to work at 8:00 a.m., and her husband picks up the child on his way home from work at 2:00 p.m. The paternal grandmother acknowledged that the paternal grandfather had tested positive for marijuana on several occasions, but she explained that he had moved out of the house for eight months so that the child could remain there while he sought treatment for his drug-use problem. The paternal grandmother stated that the paternal grandfather had not had a positive drug test for the 10 months preceding the trial of this case. The paternal grandmother also acknowledged that there had been one incident of domestic violence between her and the paternal grandfather. She explained that in 2004 she had hit the paternal grandfather and had sought medical attention for a swollen hand. DHR engaged a counselor to perform a domestic-violence assessment of the paternal grandparents' home, and the counselor concluded that there was no domestic-violence problem in the home.
The paternal grandmother acknowledged that the mother had paid child support and had bought the child several items of clothing. She said that when she and the mother are both with the child, the child always seeks out and responds to her, rather than the mother. The paternal grandmother stated that she had tried to redirect the child to respond to the mother, but, she said, the mother herself had never tried to redirect the child. The paternal grandmother testified that she did not think it was in the child's best interest to be returned to the custody of the mother. She explained that she thought the mother would allow her brother, who had a history of child molestation, to have access to the child. In addition she thought the mother would allow the child to be around the mother's parents, whose home, she said, was "not a safe place." The paternal grandmother stated that "[t]he conditions of [the maternal grandparents'] home are just almost unbearable to live in. It is just filthy."
The mother, who was 27 years old at the time of trial, testified that she had complied with everything DHR had asked her to do. She testified that she understood that neither H.D., her brother, nor C.C., the father of her younger child, could be around her children because both had a history of child sexual abuse. She stated that all the social workers and service providers who testified about her short temper, immaturity, and petulance were lying.
In transferring custody to the paternal grandparents, the juvenile court made no express findings of fact. "[I]n the absence of specific findings of fact, appellate courts will assume that the trial court made those findings necessary to support its judgment, unless such findings would be clearly erroneous." Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996). Notwithstanding the mother's progress in relating to the child, the juvenile court could well have concluded that the mother had neither the maturity nor the emotional stability to effectively parent the child. The juvenile court was authorized to find *128 that, despite the mother's testimony to the contrary, the mother did not truly comprehend the fact that her brother and her former paramour  both child sexual offenders  presented a grave threat to the child. In order to reverse the juvenile court's judgment, we would have to conclude that the judgment was so poorly supported by the evidence as to be plainly and palpably wrong. Ex Parte Walters, 580 So.2d 1352 (Ala.1991). We cannot reach that conclusion on the record before us.
The judgment of the Calhoun Juvenile Court is affirmed.
AFFIRMED.
THOMPSON, P.J., and PITTMAN, BRYAN, and MOORE, JJ., concur.