REL:  January 5, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2023-2024

_____

### CL-2023-0157 and CL-2023-0158

_____

### T.H.

### v.

### F.H. and Lee County Department of Human Resources

### Appeals from Lee Juvenile Court
### (JU-22-317.01 and JU-22-204.01)

_____

### CL-2023-0159 and CL-2023-0160

_____

### T.H.

### v.

### F.H.

### Appeals from Lee Juvenile Court
### (JU-18-56.02 and JU-16-511.02)

CL-2023-0157, CL-2023-0158, CL-2023-0159, and CL-2023-0160

EDWARDS, Judge.

T.H. ("the mother") is the mother of four children. Two of the mother's children, C.J. and C.L. ("the older children"), were the subjects of previous dependency actions in the Lee Juvenile Court ("the juvenile court"), specifically, case numbers JU-16-511.01 and JU-18-56.01, respectively. As a result of the earlier dependency actions, the older children had been placed in the legal and physical custody of their maternal grandmother, F.H. ("the maternal grandmother"). In March 2022, the mother filed requests for a change of custody regarding the older children; those petitions were assigned case numbers JU-16-511.02 and JU-18-56.02, respectively.

In April 2022, the Lee County Department of Human Resources ("DHR") filed in the juvenile court a dependency petition seeking to have the mother's third child, Co.J., declared dependent; that petition was assigned case number JU-22-204.01. In a May 2022 shelter-care order entered in case number JU-22-204.01, the juvenile court placed Co.J. in the legal and physical custody of the maternal grandmother pending a dependency adjudication.

2

In July 2022, DHR filed in the juvenile court a dependency petition seeking to have the mother's fourth child, C.H., declared dependent; that petition was assigned case number JU-22-317.01. In a July 2022 shelter-care order entered in case number JU-22-317.01, the juvenile court placed C.H. in the legal and physical custody of the maternal grandmother pending a dependency adjudication.

After a consolidated trial on the requests for a change of custody of the older children and the dependency petitions relating to Co.J. and C.H., the juvenile court, on February 15, 2023, entered in each action a single judgment determining that the older children remained dependent and that Co.J. and C.H. were dependent. The February 2023 judgment awarded legal and physical custody of the older children and of Co.J. and C.H. to the maternal grandmother, thus denying the mother's request to alter the previous award of custody of the older children to the maternal grandmother. The juvenile court also ordered the mother to pay to the maternal grandmother child support in the amount of $234 per month. The mother filed a postjudgment motion in each action, in which she argued that the juvenile court should not have ordered the mother to pay

3

CL-2023-0157, CL-2023-0158, CL-2023-0159, and CL-2023-0160

child support and that the best interests of the older children and of Co.J. and C.H. would be served by an award of joint custody to the mother and the maternal grandmother.[1] After the mother's postjudgment motions were denied by operation of law, see Rule 1(B), Ala. R. Juv. P., the mother timely appealed.

The testimony presented to the juvenile court indicated that DHR's concerns regarding the mother's fitness as a parent stemmed from the mother's mental-health issues. Phaedra Wilson, the child-abuse and neglect worker for DHR, testified that the mother, who, she said, had disclosed a diagnosis of bipolar disorder, was not mentally capable of caring for a child. Brittany Bedell, the mother's DHR caseworker, likewise testified that, because of her mental illness, the mother was not capable of caring for the older children, Co.J., or C.H. (referred to collectively as "the children") on a 24-hour basis.

Bedell testified that the mother had not held stable employment and that, instead, she had had five or six jobs during Bedell's seven-

---

[1]"Joint custody" is defined as "[j]oint legal custody and joint physical custody." Ala. Code 1975, § 30-3-151(1).

4

month tenure as her caseworker. According to Bedell, DHR was also concerned about the mother's stability because she had been attacked in her residence by four women over a social-media post about a man. Bedell further recounted that the mother had insisted that she had had two other children that had been removed from her custody but that, based on the dates that the mother had given, the mother would have had to have been under the age of 10 when the alleged removal had occurred.

Bedell testified that the maternal grandmother had allowed the mother to take C.H. to the pediatrician alone. Bedell said that the mother had failed to report to the maternal grandmother that the pediatrician had prescribed C.H. a medication. Bedell also described the mother's interactions with the children during Bedell's visits to the maternal grandmother's home as not being positive. She testified:

> "I have been out to the home and watched [the mother] interact with the kids, there was one occasion where [the mother] had [a plate of] food, and the children were hungry. They were asking her for food, and she was saying, 'Get away from me I'm not giving you any food.' She did not give them food that day...."

Bedell also described the mother's interactions with the children as "brush[ing] them off."

Regarding the mother's income, Bedell testified that the mother receives Social Security supplemental-security income ("SSI") benefits and that the maternal grandmother is the payee of those benefits. Bedell indicated that the maternal grandmother splits those benefits between the mother and the children and that the amount of the mother's SSI benefits changes when the mother works. Bedell also stated that the mother could not work more than 20 hours but did not specify whether that was per week or per month.

Eve Stalker, the mother's therapist, testified that she had provided therapy to the mother to treat bipolar disorder; she noted that, as a child, the mother had also been diagnosed with oppositional-defiant disorder and an unspecified intellectual disability. She said that she typically saw the mother once or twice per month. Stalker described the mother as having been very compliant with her treatment plan and noted that she had regularly received her medication via injections. She said that the mother had difficulty managing her finances and keeping a job.

6

The maternal grandmother testified that she had had each of the children in her home since each had been born. She explained that the mother had been diagnosed as having bipolar disorder, schizophrenia, and a learning disability when she was in the third or fourth grade. The maternal grandmother said that, as a result of her mental-health issues, the mother had been rude and disrespectful, had laughed to herself for no reason, and had talked aloud to herself or to "people" all day and night.

According to the maternal grandmother, although the mother was often in the maternal grandmother's home, the mother was not helpful and did not assist very much with the care of the children. In fact, the maternal grandmother testified that she felt "like I have five kids in the house sometimes." She also testified that the mother had failed to report that the pediatrician had prescribed medication for C.H.

Like Bedell, the maternal grandmother testified that the mother had refused to feed the children one day despite having made a full plate of food for herself. In addition, the maternal grandmother testified that, when the mother would keep Co.J. and C.H. in her room overnight, both children's diapers would be soaking wet when the maternal grandmother

would check on them. She also said that the mother would sometimes try to feed C.H. bottles of soured milk that had been out of the refrigerator for hours.

She further characterized the mother's interactions with the children as "not good." The maternal grandmother said that the children call her "mom" and call the mother by her first name. According to the maternal grandmother, the mother did not know how to parent the children and had even told the children that she did not want them. When asked whether she would consider joint custody with the mother, the maternal grandmother objected to that option, stating that the mother did not know how to be a mother and that she was not concerned about seeing the children.

The maternal grandmother testified that the mother receives SSI benefits and that she was the payee of those benefits. She explained that she would give the mother approximately half of the benefits to cover her bills and that she would use the other half to care for the children. According to the maternal grandmother, if the mother was allowed access to the full amount of the benefits, she would spend them. Like Bedell,

the maternal grandmother testified that the mother was limited to working 20 hours; however, the maternal grandmother testified that the mother was permitted to work only 20 hours per month. She also testified that, when the mother worked, the amount of the SSI benefits she received had been reduced.

Regarding the mother's work history, the maternal grandmother testified that the mother was able to secure employment but that she could not maintain it. According to the maternal grandmother, the mother had had six to eight jobs in the previous six months. She said that the mother's employment had never lasted more than a few weeks because, she said:

> "It's always their fault, but it's actually her fault. It's always somebody picking on her or this or that. The thing about her last job was at [a barbeque restaurant]. She just started there, you know, everybody was sitting around. Of course, they been there a while. You're new. So if they ask you to go do something, that's what you do, you know, because you're new there. They're sitting there just sitting. 'That's not what we asked. We asked you to go do your job.' So that's why she -- 'Why I got to go do this and that when they're sitting around?' So he just told her to go leave, clock out, and go."

The mother testified that she receives SSI benefits based on her bipolar disorder and that the maternal grandmother was the payee of

those benefits. She explained that she currently received $707 per month in benefits because she was unemployed but that, when she was employed, her monthly benefits had been reduced to $581. She also explained that the maternal grandmother would usually give her approximately $400 of her benefits each month to pay her bills, which, she said, included $41 in rent, $120 in insurance, $60 for electricity, and $60 for gas; she also testified that she had a $410 automobile payment each month but that the maternal grandmother had not given her enough money to pay that payment. Thus, the mother testified, she was unable to use the automobile for transportation.[2] According to the mother, if the maternal grandmother would give her the entire amount of her monthly SSI benefits, she could pay all of her monthly expenses, which total $691, and still afford to get her hair and nails done (for which she had paid, according to the maternal grandmother, $85 and over $100, respectively).

The mother testified that she was about to begin a job at a fast-food restaurant. She did not testify regarding her rate of pay or her expected

---

[2]Testimony in the record indicated that, because the mother had not made her monthly payment on the automobile, it had been disabled by the automobile dealership.

hours.  She testified that she had previously held a job at a pizzeria for approximately three years but that, more recently, she had remained at a job at a barbeque restaurant for only several weeks.  She explained:

> "[T]hey just be picking on me.  It don't be the coworkers.  It be like the manager and stuff like that.  And then I get there and do my work, and then they be adding stuff on for me to do more.  And that's what I don't like.  But if they tell me to do something, I'm supposed to do it."

The mother admitted that she had recently been attacked in her own home.  She said that four women had beaten her up.  She also said that she was engaged to be married; although she first declined to name her fiancé, she later referred to him as K.C.  The mother said that he had never been in any trouble.

The mother indicated that she could take care of Co.J. and C.H.  She denied the maternal grandmother's accusation that she would not check their diapers at night; she said that she would check them and that they would not be wet.  The mother testified that she would routinely pick up Co.J. and C.H. from their day-care facility and that she sometimes also kept all four of the children overnight at her apartment.  She admitted, however, that none of the children lived with her.

11

On appeal, the mother makes two arguments. She contends that the record lacks sufficient evidence to support the conclusion that the children would be best served by an award of their legal and physical custody to the maternal grandmother. She also argues that the juvenile court erred by ordering her to pay $234 per month in child support. Notably, she does not challenge the determination that Co.J. and C.H. were dependent children. The mother also fails to challenge the juvenile court's implicit conclusion that she failed to establish a basis for the modification of the custody of the older children. Thus, those two arguments have been waived. See A.B. v. Montgomery Cnty. Dep't of Hum. Res., 370 So. 3d 822, 829 (Ala. Civ. App. 2022); see also L.C. v. Jefferson Cnty. Dep't of Hum. Res., 330 So. 3d 849, 857 (Ala. Civ. App. 2021) ("It is well settled that arguments not raised in an appellate brief are deemed waived.").

We reject the mother's argument that the record lacks evidence indicating that the best interests of the children would be served by an award of custody to the maternal grandmother. As the mother concedes, "[t]he legal standard to be applied in the dispositional phase of a

CL-2023-0157, CL-2023-0158, CL-2023-0159, and CL-2023-0160

dependency proceeding is the best-interest standard." B.L.T. v. V.T., 12

So. 3d 123, 125 (Ala. Civ. App. 2008). Furthermore, our standard of

review of the disposition of a dependent child is limited.

> "Appellate review is limited in cases where the evidence is presented to the trial court ore tenus. In a child custody case, an appellate court presumes the trial court's findings to be correct and will not reverse without proof of a clear abuse of discretion or plain error. Reuter v. Neese, 586 So. 2d 232 (Ala. Civ. App. 1991); J.S. v. D.S., 586 So. 2d 944 (Ala. Civ. App. 1991). This presumption is especially applicable where the evidence is conflicting. Ex Parte P.G.B., 600 So. 2d 259, 261 (Ala. 1992). An appellate court will not reverse the trial court's judgment based on the trial court's findings of fact unless the findings are so poorly supported by the evidence as to be plainly and palpably wrong. See Ex Parte Walters, 580 So. 2d 1352 (Ala. 1991)."

Ex parte Alabama Dep't of Hum. Res., 682 So. 2d 459, 460 (Ala. 1996).

Although the mother testified at the trial that she assisted in the

care of the children and that she had been permitted unsupervised access

to them at various times, other testimony, including that of the maternal

grandmother, supports the conclusion that the mother was not equipped

to be a parent. The evidence indicated that the mother had told the

children that she did not want them, that she would "brush[] them off"

when they approached her, and that she had, on at least one occasion

13

that Bedell had observed, refused to feed them when they requested food. The maternal grandmother said that the mother did not know how to care for the children, as evidenced by her leaving Co.J. and C.H. in wet diapers and attempting to feed C.H. bottles of soured milk. Moreover, when asked, the maternal grandmother indicated that joint custody would not be in the best interests of the children because of the mother's inability to parent the children adequately without assistance. Thus, the evidence, although conflicting, was sufficient to support the conclusion that the best interests of the children would be served by an award of sole legal and sole physical custody to the maternal grandmother, and we affirm the judgment of the juvenile court in that respect.

Although we do not necessarily agree with the mother that the juvenile court improperly based the calculation of her child-support obligation on the amount of her SSI benefits, which are excluded from the definition of income by Rule 32(B)(2)(b), Ala. R. Jud. Admin., we reach a different result regarding the mother's argument regarding child support. As DHR points out, the mother testified that she had been employed in the past and was about to begin a new job at a fast-food

CL-2023-0157, CL-2023-0158, CL-2023-0159, and CL-2023-0160

restaurant; thus, like DHR, we conclude that the juvenile court based its decision to require the mother to pay child support on her employment income and not on her receipt of SSI benefits. However, we cannot discern how the juvenile court calculated child support, preventing us from affirming the award.

The record does not contain either a CS-41 form indicating the mother's anticipated income or a CS-42 form reflecting the calculations the juvenile court engaged in to arrive at the mother's $234 monthly child-support obligation. Furthermore, the record lacks sufficient information regarding the mother's rate of pay or expected hours of employment at her anticipated fast-food employment from which to determine the mother's monthly income. We also note that certain pleadings suggest that the father of C.H. and the father of Co.J. have been the subject of separate paternity actions, either or both of which may have resulted in a child-support order for one or both of those children.

> "We note that this court may affirm a child-support award if such forms are not contained in the record when the court is able to determine, from the evidence in the record, how the trial court reached its child-support calculation. Hayes v.

15

> Hayes, 949 So. 2d 150, 154-55 (Ala. Civ. App. 2006). However, in this case, this court is unable to determine from the evidence in the record the figures the trial court used in reaching its child-support determination."

Griffin v. Griffin, 159 So. 3d 67, 72 (Ala. Civ. App. 2014). As was the case in Griffin, we cannot discern in the present cases how the juvenile court arrived at its $234 per month child-support obligation. Accordingly, we reverse the judgment of the juvenile court and remand the cases for the juvenile court to recalculate the mother's child-support obligation based on her current income. See Griffin, 159 So. 3d at 72.

CL-2023-0157 -- AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.

CL-2023-0158 -- AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.

CL-2023-0159 -- AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.

CL-2023-0160 -- AFFIRMED IN PART; REVERSED IN PART; AND REMANDED WITH INSTRUCTIONS.

Thompson, P.J., and Moore, Hanson, and Fridy, JJ., concur.