PITTMAN, Judge.
A.M. ("the father") appeals from an adverse final judgment entered by the Colbert Juvenile Court in two cases involving petitions filed by the Colbert County Department of Human Resources ("DHR") seeking termination of the father's parental rights as to two children, A.C. and F.C. ("the children"), born of the father's relationship with L.C. ("the mother"). We affirm.
The record reflects that the children were born in 2009 and 2011 and that they were each removed from the care of the mother in 2011, when they were found dependent and placed in the custody of DHR and into foster care. The mother at that time did not identify the children's father. However, in September 2012, in connection with subsequent proceedings to terminate the mother's parental rights as to the children, the mother identified the father as having sired the children, and he *83 submitted to genetic testing in November 2012 that yielded results that demonstrated his parentage. The father, who was then an Ohio resident, was thereafter added to those cases as a defendant; he relocated to Alabama in March 2013. After an ore tenus proceeding, the juvenile court concluded in an October 2013 judgment that the children were dependent and that the mother's parental rights were due to be terminated; however, that court simultaneously opined that it could not, "in good conscience, terminate the rights of" the father before "[a]ppropriate services" were offered to the father "to determine if he [was] willing to place the necessary time and efforts ... to be reunified with [the] children" and stated that "relative resources should be properly investigated and either approved or rejected." The juvenile court advised that, "[b]efore [it] engage[d] in the most drastic act of terminating [the father's] parental rights, a sufficient pattern o[f] his inability to comply with the Individualized Service Plan should be established."
In April 2014, DHR again initiated termination proceedings as to the father. After an ore tenus proceeding, the juvenile court rendered a judgment in July 2014 declining to terminate the father's parental rights, opining that, despite early drug-testing results showing that the father had used marijuana, he had "completed the majority of the [Individualized Service Plan] goals" apart from acquiring stable housing and long-term employment. However, the court cautioned the father that, "[w]hile much progress has been made, much is still required"; that it "d[id] not intend [for] the children [to] continu[e] to languish in the foster care system"; and that the father "need[ed] to continue to remain drug-free." That judgment further noted that no relative resources were available and specifically excluded the father's sister as a potential relative resource.
In September 2014, DHR filed new termination petitions in which it averred that the father had a "history of instability" preventing him from "maintaining stable housing and employment" and, thereby, "from discharging parental duties and properly caring for" the children and stated that, although termination had not been ordered as to the father on DHR's preceding petitions, "the father ... [wa]s not at the present time and w[ould] not be in the foreseeable future ... able or willing to provide for ... support, training, maintenance, or education" of each child. The father, through appointed trial counsel, answered and denied that grounds for termination existed. An initial ore tenus proceeding in December 2014 revealed that the father had received an offer of employment with Wise Alloys that might allow him to offer a stable home for him and the children but that he had tested positive for marijuana use in a hair-follicle test conducted in September 2014; the juvenile court entered an order in January 2015 setting the cases for further testimony in February 2015 and directing a home study of the father's living conditions. However, at that subsequent hearing, the father admitted that he had not been hired by Wise Alloys because he had failed a criminal-background check, and evidence was adduced showing that he had again tested positive for marijuana use and alcohol use approximately three weeks before the hearing. The juvenile court thereafter entered a judgment granting DHR's termination petitions, stating, in pertinent part:
"It has been made clear to [the father] over a period of about two years since March of 2013 through adjudicatory hearings, permanency hearings, [Individualized Service Plan meetings], discussions with case workers, and in the [termination proceedings] that the path *84 to gaining custody of these two children lay in obtaining suitable housing, maintaining stable income, and avoiding drug and alcohol problems. While the felony conviction and the child support arrears probably hindered [the father's] efforts to progress, these obstacles were of his own making and not insurmountable. Unfortunately, it appears that there has been a pattern in this case of [the father's] not being able to achieve housing, employment and staying clean all at the same time for an extended period of time. [The father] has been unable to demonstrate significant stability in obtaining [sic ] a[nd] maintaining his [Individualized Service Plan] goals. [The father's] testimony has always been consistent that a new job or home is just days, weeks or months away. In all reality this vision of a new life is just another mirage that has persisted throughout this case."
The father, acting pro se, timely filed a notice of appeal from the juvenile court's judgment entered as to DHR's termination petitions, and new counsel was appointed to represent him on appeal. Because a court reporter was present at the ore tenus proceeding giving rise to the father's appeal and a transcript has been prepared, this court has appellate jurisdiction under Rule 28(a)(1)(c)(ii), Ala. R. Juv. P. The father's appellate brief raises two issues: whether the judgment was consistent with Code sections appearing in the Alabama Juvenile Justice Act ("AJJA"), Ala.Code 1975, § 12-15-101 et seq., and whether the juvenile court's judgment was erroneous based upon the claimed existence of viable alternatives to termination or the absence of an identified adoptive resource. Because the juvenile court's judgment was entered after an ore tenus proceeding, the applicable standard of review is that espoused in Ex parte State Department of Human Resources, 834 So.2d 117, 120-21 (Ala.2002), namely that appellate courts are to presume that trial courts' findings in cases of child custody are correct and that reversal will not obtain absent a clear abuse of discretion or plain error. See also Ex parte State Dep't of Human Res., 682 So.2d 459, 460 (Ala.1996).
In addressing the first issue, the father's brief correctly notes that the AJJA does not mandate the filing by DHR of a termination-of-parental-rights petition solely because a child has been in foster care for 12 of the preceding 22 months if DHR has not provided "such services as [DHR] deems necessary for the safe return of [a] child to his or her home." Ala.Code 1975, § 12-15-317(2) c. However, as this court noted in reviewing similar mandatory-filing provisions in prior law, such provisions do "not necessarily establish a 'starting point' for DHR to file a petition to terminate parental rights," and "DHR may file a termination petition whenever it determines that the best interests of the child would be served thereby." T.G. v. Houston Cnty. Dep't of Human Res., 39 So.3d 1146, 1150 (Ala.Civ.App.2009). We perceive no violation of § 12-15-317 on the part of DHR in its having filed the termination petitions giving rise to the judgment under review in September 2014-approximately two years after the father was identified by the mother.
The remaining portion of the argument presented by the father in connection with his first issue proceeds from the proposition that insufficient evidence was adduced tending to show the existence of the factors set forth in § 12-15-319 that would warrant termination of the father's parental rights. Although that statute is not specifically cited in the judgment entered by the juvenile court, the judgment is necessarily predicated upon those portions of subsection (a) providing that parental *85 rights may be terminated upon a showing by clear and convincing evidence that respondent parents are "unable or unwilling to discharge their responsibilities to and for the [pertinent] child" or that those parents' "conduct or condition ... renders them unable to properly care for the child and that the conduct or condition is unlikely to change in the foreseeable future." Among the factors mandated in § 12-15-319 by our legislature to be considered in termination cases are (a) "excessive use of alcohol or controlled substances, of a duration or nature as to render the parent unable to care for needs of the child," and (b) "[l]ack of effort by the parent to adjust his or her circumstances to meet the needs of the child in accordance with agreements reached, including agreements reached with local [DHRs] or licensed child-placing agencies, in an administrative review or a judicial review." Ala.Code 1975, § 12-15-319(a), subsections (2) & (12). The father's contentions against the correctness of the judgment necessarily impugn the sufficiency of the evidence to support the judgment, necessitating a review of whether the evidence of record at trial did, in fact, warrant the termination of the father's rights as to the children.
The record reflects that a consistent concern for DHR after the father's arrival in Alabama was the father's housing and employment situation, as well as his use of alcohol and drugs. After the juvenile court had entered its judgment terminating the mother's parental rights as to the children, but had also noted that no services had been afforded to the father by DHR, provisions addressing the father's responsibilities were added in November 2013 to the individualized service plan ("ISP") adopted as to the family. Among the provisions added was the goal that the children would "reside in a safe, stable environment in which all of their basic needs are met," pursuant to which the father was to "maintain housing which is adequate to meet the welfare needs of the children" and to "obtain/maintain employment to ensure that he is able to meet the financial needs of the children." Further, and possibly because the father had admitted to marijuana usage at the trial preceding the entry of the October 2013 judgment terminating the mother's parental rights, provisions were included in the ISP as of November 2013 stating the goal that the father would "seek help with substance abuse issues[ ] and remain free from substances," pursuant to which he would submit to random drug testing and would "exhibit behaviors that are conducive to a sober lifestyle," including achieving "negative" drug-testing results.
The juvenile court's judgment on DHR's April 2014 petitions noted that the father had received positive test results indicating marijuana usage, although the juvenile court isolated those results as having occurred before the father had enrolled in and had completed an intensive outpatient substance-abuse program. Further, although the judgment was generally complimentary of the father's progress in meeting other ISP goals, the trial court noted that the father had been evicted from his residence for nonpayment of rent and had started residing with his sister and also that the father had managed to acquire stable employment at a Wal-Mart department store earning $7.85 per hour only after holding a series of temporary jobs. At that time, the juvenile court believed that the father should be given additional time to complete the tasks set forth in the ISP.
At the ore tenus proceedings following the filing of DHR's termination petitions in September 2014, the father was shown not to have made substantial advancement in meeting the ISP goals; indeed, there was evidence indicating that he was backsliding *86 in his endeavors. First, the father's hair follicles collected on September 19, 2014, tested positive for cannabinoid chemicals, although a urine sample taken four days later did not yield a positive result. Similarly, a sample of the father's urine taken in January 2015 yielded a positive result for alcohol usage that he sought to attribute to "cold medicine" ingestion despite his pretest statement that he had not had any alcohol or prescription drugs in the preceding 30 days before the drug test, and a February 2015 urinalysis yielded positive test results for both alcohol products and cannabinoid chemicals. Although the father sought to blame his positive alcohol test result on having taken "NyQuil" cold medicine, and to blame his positive cannabinoid test on secondhand smoke from a roommate's marijuana cigarettes, the juvenile court heard from an employee of the pertinent drug-testing lab tending to indicate that the alcohol test would not yield a positive result upon consumption of cough-medicine alcohol and that a false cannabinoid positive test result, although theoretically possible in a living situation in which the pertinent residence "is fogged up 24 hours a day" for a long period, was extremely unlikely. The juvenile court could thus have determined from the evidence that the father was not maintaining sobriety as set forth in the ISP.
The evidence adduced in the ore tenus proceeding leading up to the judgment under review was also not favorable to the father as to his housing and employment situation. The record reveals that the father voluntarily left his Wal-Mart job because he believed he was going to be hired to work at Wise Alloys, yet he was not ultimately offered employment there because his criminal record reflected a Class A felony for having been involved in drug trafficking in 1993. As of the February 2015 hearing, the father expected to be employed by a temporary-staffing agency performing temporary work for a flooring company, but he admitted that he had not heard back regarding a required drug test and that he would be limited to 90 days of temporary work with the temporary-staffing agency, after which the flooring company could choose to hire him or not to hire him. However, the father also admitted at the February 2015 hearing that he had been terminated from one of his post-Wal-Mart employment situations with Great Southern Wood because of poor work performance. Further, as to housing, as of February 2015, the father had moved out of his sister's home and had moved into a one-bedroom apartment with a male roommate that, the father admitted, was "a little cluttered" and "not an appropriate place for either of the children," although he anticipated being able to occupy rent-subsidized public housing beginning in March 2015.
Based upon the record evidence set forth herein, we cannot conclude that the juvenile court erred in determining that the father had not made sufficient progress in achieving the directives of the ISP. Although the record does indicate that the father had managed periods of relative sobriety, he proved unable in the juvenile court's view to resist the consumption of alcohol and controlled substances sufficiently to stabilize his lifestyle so as to be able to care for two young children, the older of whom was shown to have near-constant acute allergy symptoms. The father further did not come forward with evidence indicating that he had been able to maintain steady employment or to secure and maintain appropriate housing despite notice from the ISP itself and clear warnings from the juvenile court that doing so would be expected of him. Because subsections (2) and (12) of § 12-15-319(a) provide that excessive use of controlled substances and failure to make progress in *87 fulfilling ISP requirements are factors to be considered in assessing the overarching issue of a parent's ability to properly care for his or her children, and because the juvenile court could properly have drawn the negative inferences that it did from the evidence presented, we cannot perceive a violation of § 12-15-319 warranting reversal.
The father's second issue concerns whether the juvenile court properly considered and rejected viable alternatives to termination. However, the juvenile court explicitly rejected the father's sister as a viable relative resource to care for the children, and the father's brief to this court does not indicate that any other appropriate relative resources exist. To the extent that the father relies upon the lack of identifiable adoptive resources for the children and the opinion of the children's guardian ad litem to the effect that termination under such circumstances would be inappropriate, we note that "the lack of an identified adoptive resource does not necessarily preclude termination of parental rights," T.L.S. v. Lauderdale Cnty. Dep't of Human Res., 119 So.3d 431, 439 (Ala.Civ.App.2013), and that a guardian ad litem's recommendation in a termination-of-parental-rights action is by no means binding on a juvenile court. See S.M.W. v. J.M.C., 679 So.2d 256, 258 (Ala.Civ.App.1996) (affirming denial of termination in spite of guardian ad litem's contrary recommendation to juvenile court). Finally, to the extent that the father's brief may be read as arguing that the status quo-foster care subject to his visitation with the children-was due to be maintained because of his relationship with the children, we note that the juvenile court determined that, notwithstanding the existence of some sort of bond between the father and the children, no testimony was adduced tending to show "that the children would suffer emotionally if that bond was severed." The juvenile court thus did not err in determining that no viable alternative existed to the termination of the father's parental rights in view of his conduct indicating an enduring inability to care for the children notwithstanding the father's insistence that viable alternatives to termination existed.
The dissent in this case would reverse the juvenile court's judgment and remand the cause with instructions that the prejudgment status quo be maintained based upon the absence of an adoptive resource, relying upon a line of cases such as C.M. v. Tuscaloosa County Department of Human Resources, 81 So.3d 391 (Ala.Civ.App.2011), that stand for the general proposition that evidence of a parent's maintenance of consistent contact and communication with dependent children so as to indicate the potential existence of an emotional bond between parent and child may indicate, in certain circumstances, that the child's best interests may be served by maintaining preexisting foster-care arrangements and parental visitation.
However, "[t]he question whether viable alternatives to termination of parental rights exist[ ] is a question of fact," and "[o]ur review of a juvenile court's decision on the viability of a particular alternative to termination of parental rights is governed by the ore tenus rule." H.W. v. Morgan Cnty. Dep't of Human Res., 166 So.3d 142, 146 (Ala.Civ.App.2014). Here, the juvenile court expressly determined that "there was no testimony provided that the children would suffer emotionally if th[e parental] bond was severed," and there was evidence adduced tending to show that, during visits, the father tended to interact less with the children when the mother was in attendance and that he had, in contravention of DHR policy, made promises to take the children to particular *88 places on future visits-evidence that could properly have been deemed by the juvenile court to indicate a more fragile familial bond than might otherwise warrant forbearance as to a parent's clear inability or unwillingness to assume parental responsibility.
Based upon the foregoing facts and authorities, the juvenile court's judgment is due to be affirmed.
AFFIRMED.
THOMPSON, P.J., and THOMAS and DONALDSON, JJ., concur.
MOORE, J., dissents, with writing.