PER CURIAM.
T.D.K. (“the mother”) appeals from the judgment terminating her parental rights to two of her children, A.B.M. and T.O.M. (“the children”).[1] The judgment awarded legal custody of the children to their father, T.M. (“the father”), and L.A.W., the former wife of the children’s paternal uncle. L.A.W. was awarded physical custody of the children, subject to visitation by the father.
The record indicates the following. The mother was 28 years old at the time of the trial. She and the father have never been married to each other. A.B.M., the older of the children at issue in this case, was born in September 2002. The mother was still in high school when she became pregnant with A.B.M.; however, she said that she dropped out of school because of difficulties she had during her pregnancy. T.O.M. was born in May 2004.
The Calhoun County Department of Human Resources (“DHR”) first became involved with the mother when, in October 2006, T.O.M. received burns over his body when he was scalded by water heating on a stove. The mother testified that they were living at a friend’s house when the accident occurred. She said that she and the friend were cooking and had turned their backs “for just a moment” when someone knocked at the door. While their backs were turned, she said, one of the children in the house pulled a pot of hot water off the stove. The record indicates *1008 that DHR took no action against the mother at that time.
In April 2007, DHR investigated a report that the mother’s boyfriend, G.H., was physically abusing the children. Charles Parker, the DHR investigator, testified that he learned that G.H. would sometimes make the children take off their clothes before beating them with a belt so hard that the beating would cause bruising. G.H. would also place the children in the clothes dryer to punish them. On at least one occasion, G.H. turned on the clothes dryer after placing T.O.M. inside. When Parker examined the children, he saw multiple bruises on A.B.M.’s inner thigh. T.O.M. had bruising on his chest and marks around one of his nipples that Parker said were consistent with bite marks.
There was evidence indicating that G.H. had physically abused the mother as well. The children had witnessed that abuse on occasion. The mother initially denied knowing anything about G.H.’s conduct toward the children. However, she eventually told Parker that she was aware that G.H. was beating the children and putting them in the clothes dryer but that she could not do anything to stop him. The mother said that G.H. would beat the children because, she said, he had told her she did not hit them hard enough.
Parker testified that, as a result of his initial interviews, the mother entered into a safety plan to remove the children from the mother and G.H.’s home. In April 2007, the children were placed with the father, who lives in Gadsden. Although Parker advised the mother that DHR could help her find shelter away from G.H., the mother chose to stay with him. The mother was also advised that she had to leave G.H. before the children would be allowed to live with her again. Parker said that he opened the mother’s case for ongoing services and said that the mother would have been assigned a social worker to follow through with her; however, he said, the mother told him she was moving to Gadsden, in Etowah County. Parker intended for the mother’s case to be transferred to the Etowah County DHR; however, no action appears to have been taken by that agency, and DHR’s involvement with the mother ended in 2007.
G.H. was convicted of child abuse in connection with his treatment of the children and sentenced to one year in jail. The mother did move to Gadsden, but she admitted that she never lived in one place very long. L.A.W. testified that the mother made few attempts to visit or call the children once they went to live with the father, and subsequently, other family members. When G.H. was released from jail, the mother moved back to Calhoun County and lived in an apartment next door to G.H.’s mother.
Several witnesses testified regarding an incident that occurred in November 2009, after G.H. had been released from jail. The mother was visiting her sister’s house, and the children were also there. The mother was speaking with G.H. on the telephone and handed the telephone to A.B.M. for her to speak with him as well. A.B.M. refused, and the mother began to “whip” her with a belt. When A.B.M. would not stop crying, the mother put her in a closet.
Africa Bell, a therapist at the CED Mental Health Center, testified that both children had told her during their therapy sessions that they did not want to live with the mother or even to see the mother. A.B.M. told Bell that the incident in which T.O.M. was scalded in 2006 had not been an accident and that the mother had purposefully scalded him.
During her testimony, the mother acknowledged that she had been in jail on *1009 several occasions, that she did not have a job, that she had no income, that she had no vehicle and no valid driver’s license, and that she did not have a stable place to live. She admitted that, at that time, she was unable to care for the children. Other than the gifts she sometimes gave to the children, there is no evidence indicating that the mother provided financial support for the children after they were removed from her custody.
The children began living with their paternal grandmother in the summer of 2007. A little more than a year later, in October 2008, they began living with L.A.W. In 2009, the mother said, she signed “temporary guardianship papers” for the children while they were living with L.A.W. Afterward, the mother was arrested for failing to pay traffic fines and sentenced to serve time in jail beginning in November 2009. In March 2010, she was released from jail and called L.A.W. to arrange a visit with the children. The mother testified that L.A.W. refused her request because, the mother said, L.A.W. believed that she was seeing G.H. again.
L.A.W. then contacted the mother and asked her to sign a second set of “temporary guardianship papers” because the other set was no longer valid and she needed the papers to enroll the children in school and for other purposes. At about that time, the mother testified, she discovered that DHR had closed her ease and that she still had legal custody of the children. L.A.W. testified that she learned that the mother planned to remove the children from her home and to give' custody of them to the mother’s sister.[2] The dispute between L.A.W. and the mother escalated until, on June 11, 2010, the father and L.A.W. filed petitions seeking the termination of the mother’s parental rights to the children and also seeking joint custody of the children. That same day, they filed a “motion for ex parte temporary custody” of the children. The juvenile court granted the motion the day it was filed.
On February 17, 2011, the juvenile court held a hearing on the petitions to terminate the mother’s parental rights and for joint custody. On March 1, 2011, the juvenile court entered its judgment terminating the mother’s parental rights. The juvenile court found that, since the children had gone to live with the father in April 2007, the mother had had nearly four years to adjust her circumstances to meet the needs of the children. The juvenile court also noted that the children had lived with L.A.W. for two and a half years and were entitled to the opportunity to have a permanent home. The juvenile court terminated the mother’s parental rights to the children, awarded legal custody of the children to the father and L.A.W., and awarded physical custody of the children to L.A.W., subject to the father’s visitation rights. The mother’s visitation rights were explicitly terminated. The mother timely appealed the termination of her parental rights.
Our standard of review of an appeal from a judgment terminating parental rights after an ore tenus hearing is well settled. A trial court’s factual findings based on ore tenus evidence are presumed correct. See Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994). “ ‘This presumption is based on the trial court’s unique position to directly observe the witnesses and to assess their demeanor and credibility.’ ” *1010 Ex parte T.V., 971 So.2d 1, 4 (Ala.2007) (quoting Ex parte Farm, 810 So.2d 631, 633 (Ala.2001)). On appeal, a judgment entered on factual findings based on ore tenus evidence will not be reversed “ ‘unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court’s discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow.’ ” Perkins, 646 So.2d at 47 (quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App. 1993)).
Furthermore, a juvenile court’s judgment terminating parental rights must be supported by clear and convincing evidence. Bowman v. State Dep’t of Human Res., 534 So.2d 304, 305 (Ala.Civ.App. 1988). “Clear and convincing evidence” is “ ‘[ejvidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion.’ ” L.M. v. D.D.F., 840 So.2d 171, 179 (Ala.Civ.App.2002) (quoting § 6-11-20(b)(4), Ala.Code 1975).
“Where ... the custodial parent petitions to terminate the parental rights of the noncustodial parent, the trial court’s analysis consists of two parts. [Ex parte Beasley,] 564 So.2d [950,] 954 [ (Ala.1990) ]. First, the trial court must determine whether grounds exist for terminating parental rights. 564 So.2d at 954. Grounds exist for terminating parental rights if the parent in question is ‘unable or unwilling to discharge [his] responsibilities to and for the child, or ... the conduct or condition of the parent[ ] is such as to render [him] unable to properly care for the child and ... such conduct or condition is unlikely to change in the foreseeable future.’ Ala. Code 1975, [former] § 26-18-7(a) [ (amended and renumbered as § 12-15-319(a))]....”
Ex parte J.E., 1 So.3d 1002, 1006-07 (Ala. 2008).
The mother contends that, in terminating her parental rights, the juvenile court erred in not considering her present circumstances. It is true that this court has held that “the existence of evidence of current conditions or conduct relating to a parent’s inability or unwillingness to care for his or her children is implicit in the requirement that termination of parental rights be based on clear and convincing evidence.” D.O. v. Calhoun Cnty. Dep’t of Human Res., 859 So.2d 439, 444 (Ala.Civ. App.2003). We have also held that the juvenile court may properly consider past history and present circumstances in a termination proceeding. W.P. v. Madison Cnty. Dep’t of Human Res., 980 So.2d 1016,1023 (Ala.Civ.App.2007).
In this case, the mother’s own testimony indicated that her present circumstances were such that she could not properly care for the children. She testified that she had no job, no income, no vehicle, and no stable housing. She acknowledged that she did not have the means to provide for the children and said that, as of the time of the hearing, she was not in a position to have custody of the children. Furthermore, despite the mother’s assertion that she was no longer seeing G.H., evidence was presented indicating that she had, in fact, continued to see him after she was released from jail in March 2010. The mother’s present circumstances are consistent with her history.
There is no evidence indicating that the mother has put forth the effort to improve her circumstances. Accordingly, we conclude that the record contains sufficient evidence to support the juvenile court’s finding that the mother is unable or unwill *1011 ing to discharge her responsibilities to and for the children, or that her conduct or condition renders her unable to properly care for the children, warranting the termination of the mother’s parental rights.
The mother also contends that the father and L.A.W. failed to present clear and convincing evidence indicating that no viable alternatives existed to terminating her parental rights. She correctly notes the second prong that the juvenile court is required to find before it can properly terminate one’s parental rights: “If the trial court determines, based on all relevant factors, that grounds exist for terminating parental rights, then the court must proceed to the second part of its analysis, which is to consider whether all viable alternatives to terminating parental rights have been exhausted. [Ex parte ] Beasley, 564 So.2d [950,] at 954 [ (Ala.1990) ].” Ex parte J.E., 1 So.3d at 1008.
Parents and their children share a fundamental right to family integrity that does not dissolve simply because the parents have not been model parents. Santosky v. Kramer, 455 U.S. 745, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). That due-process right requires states to use the most narrowly tailored means of achieving the state’s goal of protecting children from parental harm. Roe v. Conn, 417 F.Supp. 769, 779 (M.D.Ala. 1976). Thus, if some less drastic alternative to termination of parental rights can be used that will simultaneously protect the children from parental harm and preserve the beneficial aspects of the family relationship, then a juvenile court must explore whether that alternative can be successfully employed instead of terminating parental rights. Id.
However, a juvenile court has no duty to use reasonable efforts to reunite a family in cases in which a parent has subjected a child to chronic physical abuse. § 12-15-312(c), Ala.Code 1975. Thus, the juvenile court in this case was not required to consider counseling or some other method of rehabilitating the mother to prevent further abuse of the children.
Our caselaw has recognized that removing the child from the abusive parent’s custody but allowing that parent restricted visitation rights can be a viable alternative to termination of parental rights when it appears that a wayward parent cannot be rehabilitated but still shares a deep and beneficial emotional relationship with his or her children. See, e.g., D.M.P. v. State Dep’t of Human Res., 871 So.2d 77, 95 n. 17 (Ala.Civ.App.2003) (plurality opinion). In such cases, permanently depriving children of association with a parent by terminating parental rights could do more harm than good to the children. Id. However, in this case, both children informed their therapist that they did not want to see the mother again. Thus, the juvenile court determined, properly so, that visitation between the mother and the children was not a viable alternative to termination of the mother’s parental rights.
Under the facts of this case, we conclude that substantial evidence supports the juvenile court’s judgment terminating the mother’s parental rights to the children. Accordingly, the judgment is affirmed.
AFFIRMED.
All the judges concur.

. The mother has one other child, the children’s older half sibling, who lives with his father. That child is not involved in this case.

. After the father and L.A.W. filed their petitions for custody, the mother’s sister and her husband also filed a petition seeking custody of the children. Before the hearing in this case, however, the mother's sister, the father, and L.A.W. reached an agreement, pursuant to which the mother’s sister and her husband withdrew their petition.