MOORE, Judge.
C.M. (“the mother”) appeals from judgments entered by the Tuscaloosa Juvenile Court terminating her parental rights to A.M. and Ch.M. (“the children”). We reverse.

Procedural History

On March 10, 2008, the Tuscaloosa County Department of Human Resources (“DHR”) filed petitions to terminate the parental rights of the mother to the children. On August 26, 2010, the juvenile court entered judgments terminating the mother’s parental rights and stating, in pertinent part:[1]
“4. That the child[ren are] dependent as defined by statute, and the facts regarding dependency alleged in the petition[s] filed in [these] case[s] are determined to be true.
“5. That the conduct and condition of the mother is such as to render her unable to properly care for the child[ren] and that such conduct or condition is unlikely to change in the foreseeable future. Testimony of expert witness Dr. Kathy Ronan before this Court indicated the mother is mentally ill and not capable of caring for her children, and that rehabilitative efforts are not likely to succeed.
“6. That the mother lacked the ability to comply with all the terms and conditions of the Individualized Service Plan. DHR provided rehabilitative services, and expert testimony showed continued rehabilitative services would not improve the mother’s chronic mental health condition and would be unsuccessful if continued. The said chronic condition makes the mother unable to adjust her circumstances to meet the needs of the child[ren],
“7. That there is no suitable relative of the mother who is both fit and willing to serve as a relative placement resource for the child[ren].
“8. All viable alternatives to termination of parental rights have been considered and no such alternative exists.
“9. That the Court has also considered the environment into which the children] would be released if returned to the mother and finds that it is in the *393 child[ren]’s best interests not to be released into that environment.
“10. That the child[ren are] adoptable and in need of and [are] entitled to the care and protection of the State of Alabama; the children’s morals, health and general welfare will be best served by granting permanent care, custody and control to ... DHR ..., and DHR is equipped to care for and is able and willing to assume custody of the children] if committed by final order of this Court to DHR.
“11. Although the Court is reluctant to enter this Order because of the bond between the mother and children], the testimony is clear and convincing that, regrettably, the mother is unable to properly care for the children] and that this condition is unlikely to change in the foreseeable future. The Court has specifically considered the mental illness of the mother under Section 12-15-319(a)(2), Code of Alabama 1975.”
On September 3, 2010, the mother filed a motion to alter, amend, or vacate the juvenile court’s judgments or, in the alternative, for a new trial. On September 14, 2010, the juvenile court set the post-judgment motion for a hearing on October 6, 2010.[2] On October 6, 2010, the parties argued the postjudgment motion, and, on or about October 15, 2010, the juvenile court purported to enter an order amending the judgments to change a citation to the correct Code section and to state that it had considered the recommendation of the children’s guardian ad litem. On November 1, 2010, the mother filed notices of appeal from the judgments. The mother’s appeals were assigned appellate numbers 2100144 and 2100145 and were consolidated by this court ex meru moto.
On January 28, 2011, the mother filed in this court a motion for leave to file in the juvenile court a Rule 60, Ala. R. Civ. P., motion; this court granted that motion on that same day. Also on that same day, the mother filed her Rule 60 motion in the juvenile court; that motion alleged that, due to mistake, inadvertence, or excusable neglect, the parties had failed to realize that the mother’s postjudgment motion had been denied by operation of law before that motion was heard and ruled upon. She requested that the juvenile court grant her Rule 60(b) motion and either set her postjudgment motion for a hearing within 14 days or allow the motion to be denied by operation of law. On January 28, 2011, the juvenile court granted the mother’s Rule 60 motion, stating that the mother’s previously filed postjudgment motion would be heard within 14 days or would be denied by operation of law.[3] On February 2, 2011, the juvenile court entered an order making the same changes to its previous judgments that it had previously purported to make on October 15, 2010, and stating that the previous judgments were otherwise unchanged. The mother again filed notices of appeal, and those appeals were assigned appellate numbers 2100464 and 2100465 and were consolidated by this court ex meru moto. On March 1, 2011, this court dismissed appeal numbers 2100144 and 2100145 as having been untimely filed.[4]
In appeal numbers 2100464 and 2100465, the mother’s appellate counsel filed a “no-merit” brief and a motion to withdraw, *394 pursuant to Anders v. California, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). In accordance with the procedure adopted by this court and set out in Anders and J.K. v. Lee County Department of Human Resources, 668 So.2d 813 (Ala.Civ.App.1995), that motion and brief were served upon the mother. The mother did not provide this court with a list of additional points or issues to be considered on appeal. On July 11, 2011, this court entered an order directing the mother’s counsel to file a supplemental brief addressing whether the best interests of the children would be served by terminating the mother’s parental rights in light of the beneficial emotional bond that exists between the mother and the children. See D.M.P. v. State Dep’t of Human Res., 871 So.2d 77, 95 n. 17 (Ala.Civ.App.2003) (plurality opinion). The mother’s counsel filed a supplemental brief, and DHR filed a response thereto.

Facts

The evidence at trial revealed that the children had been in foster care since 2000, when the mother suffered what was described by Dr. Kathleen Ronan, a clinical and forensic psychologist who had evaluated the mother, as an acute exacerbation or a complete breakdown. Dr. Ronan testified that the mother has schizoaffective disorder and is mildly mentally retarded. Dr. Ronan testified that the mother had tried to the best of her ability to get better but that her best efforts had not been enough for the mother to be capable of parenting the children. She testified that the mother’s handicaps from her mental illness and mild retardation prevent the mother from being able to gain the skills necessary to manage the children by herself. She testified that, although she had made recommendations regarding the mother’s treatment, she did not think that compliance with those recommendations would effectively restore the mother to the point of being able to parent the children.
Glenda Sims, a foster-care worker for DHR, also testified that the mother could not parent the children. She testified that the mother had done everything DHR had asked her to do. Sims testified that the mother receives counseling, therapy, and monitoring services through Indian Rivers, a program maintained through the Department of Mental Health. She testified that DHR had provided the mother with parenting-skills services through a behavior aide, as well as transportation and an aide for visits. Sims testified that before she began working for DHR, the mother was supposed to have received family counseling or parenting-skills services, but, she said, the mother had refused those services. She testified that DHR had attempted to locate a program that would enable the mother and the children to live in a community together but that it had been unable to find such a program. Sims testified that she does not know of any other local services for which the mother would qualify. Dr. Ronan also testified that she did not know of any other resource that would offer the mother any service that was not available through Indian Rivers.
Sims testified that DHR had attempted to terminate the mother’s parental rights previously but that the juvenile court had denied the petitions in July 2007 and had instructed DHR to consider the mother’s sister, K.C., as a resource for the children. Sims testified that DHR had subsequently conducted a home study on K.C.’s home and had begun having visits in K.C.’s home but that, at the end of 2007, K.C. had stated that she did not want to be considered as a resource for the children. She testified that DHR had pursued getting a home study on the home of the mother’s two other sisters in Michigan but that *395 there was no electricity or water available in the home and the home study was not approved.
Sims testified that it is possible that the children could be adopted if DHR could find parents who can give the children a structured environment. She testified that previous foster parents had expressed interest in adopting A.M. and that certain persons had expressed interest in adopting Ch.M. She testified that DHR would hold permanent custody of the children until they were adopted and that DHR would commit to continuing contact between the children and the mother.
Michael Holtzhauer, an employee of Alabama Mentor, a therapeutic foster-care agency that contracts with DHR to provide therapeutic foster homes, testified that, at the time of the final hearing, A.M. was 13 years old and Ch.M. was 12. She testified that both children were in therapeutic foster homes. Holtzhauer testified that Ch.M. is bipolar and that A.M. has “psychothymic disorder,” which is a depressive disorder. She testified that typically parents who have children in therapeutic foster care are not involved with the children but that the mother is an exception. She testified that she maintains contact with the mother more than she does with other biological family members of children she works with. Holtzhauer also testified that the mother has always done everything she has asked her to do and that the mother tries to do her best parenting the children. She testified, however, that the mother is unable to supervise the children alone.
Holtzhauer testified that the children love the mother and that they have a bond. She testified that the mother talks to the children every day and that she will address any behavioral issues that the children have been having. She testified that A.M. has been disrespectful to the mother, which is stressful to the mother. She testified that she feels that A.M. sometimes uses the mother and is manipulative. She testified that it causes her concern that the mother gives money too freely to A.M., but she also testified that the mother had refused to give A.M. money to add minutes to her cellular-telephone account because A.M. had gotten in trouble. Holtzhauer testified that A.M. had stated that she was fine with being adopted but that she wanted to maintain contact with the mother and Ch.M. She testified that A.M. did not want the mother’s parental rights terminated if she was not assured that she could retain contact with the mother. She testified that A.M. was currently in her fourth foster home. She testified that A.M. had regressed in her behavior partially due to normal teenage issues and partially due to her most recent move from the home of a foster mother with whom she had been close. Holtzhauer testified that Ch.M. had made some improvements recently. She testified that she thought that the children would do well to maintain supervised contact with the mother. She also testified that the results of a recent psychiatric evaluation on A.M. resulted in a recommendation that she retain contact with the mother.[5] Dr. Ronan testified that moving from one foster home to another affects children and that such moves would have a particularly negative affect on a child with bipolar disorder. Dr. Ronan also testified that Ch.M. and the mother have a strong bond and that Ch.M. is very protective of the mother.
The mother testified that, before her psychiatric breakdown, she had been em *396 ployed by the Department of Veterans Affairs for 11 ½ years. She testified that she receives a monthly medical retirement check as well as a Social Security disability check. The mother testified that she lives in a one-bedroom apartment but that she is looking for a house. She testified that she does not drive but that she uses public transportation. The mother testified that she had not been in any psychiatric facility since 2002. She testified that she has been staying well for herself and the children. She testified that she sees her doctor and her psychiatrist, goes to therapy, and takes medication. She testified that she and the children have a strong bond. The mother testified that she can take care of the children full time. She testified that, if she could not get the children back, she would want them to be adopted if she could see them. She testified that she talks to the children at least once a day and visits with them twice a month. She testified that she does something special for the children for Christmas and birthdays. She testified that she planned on paying for A.M. to get her hair done before school started. She introduced into evidence a card that A.M. had given her for Mother’s Day and a present that Ch.M. had given her for Christmas. She read into the record what A.M. had written on the card: “Thanks for everything you have done for me. I watched myself become a nice young lady because of you. Love, your daughter. Boo.” She testified that she gives A.M. money to purchase cellular-telephone minutes when her behavior is good. She also testified that she takes Ch.M.’s Playstation video-game console away from him as punishment for poor behavior. She testified that she believes the children’s foster parents are doing a wonderful job, and that she and the foster mother discuss A.M.’s behavior together.
At the conclusion of the evidence, the children’s guardian ad litem recommended that the petitions for termination of parental rights be denied because of the bond between the mother and the children. DHR’s attorney responded that, although Alabama does not have “open adoptions,” DHR would recruit adoptive parents who would allow the mother to be a part of the children’s lives.

Standard of Review

“This court’s standard of appellate review of judgments terminating parental rights is well settled. A juvenile court’s factual findings, based on ore tenus evidence, in a judgment terminating parental rights are presumed to be correct and will not be disturbed unless they are plainly and palpably wrong. See, e.g., F.I. v. State Dep’t of Human Res., 975 So.2d 969, 972 (Ala.Civ.App.2007). Under express direction from our supreme court, in termination-of-parental-rights cases this court is ‘required to apply a presumption of correctness to the trial court’s finding[s]’ when the trial court bases its decision on conflicting ore tenus evidence. Ex parte State Dep’t of Human Res., 834 So.2d 117, 122 (Ala.2002) (emphasis added). Additionally, we will reverse a juvenile court’s judgment terminating parental rights only if the record shows that the judgment is not supported by clear and convincing evidence. F.I., 975 So.2d at 972.”
J.C. v. State Dep’t of Human Res., 986 So.2d 1172, 1183 (Ala.Civ.App.2007) (footnote omitted).

Discussion

The mother has argued in her supplemental brief to this court that the juvenile court exceeded its discretion in terminating the mother’s parental rights because, she says, termination was not in the best interests of the children. The mother also points out that retention of a *397 child in foster care while allowing a parent to visit can be a viable alternative to termination of parental rights. See T.D.K. v. L.A.W., 78 So.3d 1006 (Ala.Civ.App.2011).
“Parents and their children share a fundamental right to family integrity that does not dissolve simply because the parents have not been model parents. Santosky v. Kramer, 455 U.S. 745, 754, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). That due-process right requires states to use the most narrowly tailored means of achieving the state’s goal of protecting children from parental harm. Roe v. Conn, 417 F.Supp. 769, 779 (M.D.Ala.1976). Thus, if some less drastic alternative to termination of parental rights can be used that will simultaneously protect the children from parental harm and preserve the beneficial aspects of the family relationship, then a juvenile court must explore whether that alternative can be successfully employed instead of terminating parental rights. Id.”
T.D.K, 78 So.3d at 1011. In D.M.P, supra, a plurality of this court reasoned:
“[I]f, notwithstanding the unfitness of a parent, there remains a significant emotional bond between a child and an unfit parent, and it has been demonstrated that some alternative-placement resource would allow the child to visit periodically with the unfit parent so as to reap the benefit of partially preserving that relationship without incurring the harm of the child being raised on a day-to-day basis by an unfit parent, the court would be required to weigh the advantage of that arrangement against the advantage of termination and placement for adoption with permanent fit parents, and to decide which of these alternatives would be in the child’s best interest.”
D.M.P., 871 So.2d at 95 n. 17. Citing D.M.P., this court stated in T.D.K:
“Our caselaw has recognized that removing the child from [an] abusive parent’s custody but allowing that parent restricted visitation rights can be a viable alternative to termination of parental rights when it appears that a wayward parent cannot be rehabilitated but still shares a deep and beneficial emotional relationship with his or her children. See, e.g., D.M.P. v. State Dep’t of Human Res., 871 So.2d 77, 95 n. 17 (Ala. Civ.App.2003) (plurality opinion). In such cases, permanently depriving children of association with a parent by terminating parental rights could do more harm than good to the children. Id.”
T.D.K, 78 So.3d at 1011.
In the present case, the evidence indicates and the juvenile court found that a bond exists between the children and the mother. The evidence also indicates that the children love their mother and that she has been an active part of the children’s lives — for example, by making sure that A.M. had a hair cut before the start of the school year, by doing something special for the children for their birthdays and for Christmas, and by addressing behavioral issues with the children. It was undisputed that the mother talks to the children at least once a day and that she visits them twice a month. A psychiatric evaluation of A.M. resulted in a recommendation that she retain contact with the mother. Holt-zhauer testified that A.M. had stated that she did not want to be adopted unless she would be able to maintain contact with the mother. Even DHR appeared to recognize the beneficial relationship that existed between the mother and the children because Sims, the foster-care worker for DHR, testified that DHR would commit to continuing the mother’s visitation until the *398 children were adopted. Based on the foregoing, it is clear that maintaining visitation with the mother is in the best interests of the children.
Because there was clear and convincing evidence indicating that the best interests of the children would be served by maintaining visitation with the mother, the juvenile court was required to “weigh the advantage of [maintaining visitation with the mother] against the advantage of termination and placement for adoption with permanent fit parents, and to decide which of th[o]se alternatives would be in the child[ren]’s best interestfs].” D.M.P., 871 So.2d at 95 n. 17. In this case, there was some evidence tending to show that the children would benefit from permanency; however, there was no certain testimony regarding the children’s prospects for adoption. Both children have disorders that, according to Sims, require DHR to find adoptive parents who can maintain the children in a structured environment. Because of the uncertainty regarding the children’s prospects for adoption, we conclude that the record does not contain clear and convincing evidence indicating that the children would achieve permanency if the mother’s parental rights were terminated. Accordingly, the desire for permanency in this case cannot override the clear and convincing evidence indicating that maintaining visitation with the mother is in the children’s best interests.
Based on the foregoing, we conclude that, in this exceptional case, termination of the mother’s parental rights was not in the best interests of the children because of the beneficial relationship between the mother and the children. We, thus, reverse the juvenile court’s judgments terminating the mother’s parental rights and remand this cause for the entry of a judgment consistent with this opinion.
2100464 — REVERSED AND REMANDED WITH INSTRUCTIONS.
2100465 — REVERSED AND REMANDED WITH INSTRUCTIONS.
THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ., concur.

. The juvenile court entered a separate judgment in each case. Although the judgments have some very minor differences, those differences do not affect the substance of the judgments. Thus, we have included the language from the judgment in case no. JU-02-836.05, which is representative of the substance of both judgments.

. Under Rule 1(B), Ala. R. Juv. P., the mother’s postjudgment motion was denied by operation of law on September 17, 2010.

. The issue whether the Rule 60 motion was properly granted is not before this court.

. We have incorporated the record from appeal numbers 2100144 and 2100145 into the present appeals.

. The report noted that children fare better when they have contact with their birth parents.