REL: February 10, 2023

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# ALABAMA COURT OF CIVIL APPEALS

## OCTOBER TERM, 2022-2023

———————————————

### CL-2022-0694 and CL-2022-0695

———————————————

### T.W.

### v.

### Calhoun County Department of Human Resources

### Appeals from Calhoun Juvenile Court
### (JU-19-972.02 and JU-19-973.02)

MOORE, Judge.

In appeal number CL-2022-0694, T.W. ("the mother") appeals from a judgment entered by the Calhoun Juvenile Court ("the juvenile court") terminating her parental rights to S.H.W., who was born on September 4, 2012. In appeal number CL-2022-0695, the mother appeals from a

separate judgment entered by the juvenile court terminating her parental rights to H.T., who was born on February 2, 2017. We reverse the juvenile court's judgments.

Procedural History

On August 24, 2021, the Calhoun County Department of Human Resources ("DHR") commenced an action by filing a petition to terminate the parental rights of the mother and of J.T. ("the father") to S.H.W. That same date, DHR commenced a separate action by filing a petition to terminate the parental rights of the mother and of the father to H.T. The juvenile court consolidated the actions for the purposes of trial, which commenced on November 19, 2021, and was concluded on April 26, 2022. On April 26, 2022, the juvenile court entered a separate judgment in each action terminating the parental rights of the mother and the father to S.H.W. and J.T. ("the children").[1] The mother filed a postjudgment motion in each action on May 4, 2022; the juvenile court entered orders denying those motions on May 11, 2022. The mother filed

---

[1]The father has not appealed the judgments terminating his parental rights.

2

a timely notice of appeal in each action on May 25, 2022. This court consolidated the mother's appeals ex mero motu.

Facts

The facts pertinent to the disposition of these appeals are as follows. The children were residing with the mother and, apparently, at times, the father, in a mobile home in Calhoun County until October 2019, when DHR removed the children from the mother's custody. While the children were in her custody, the mother, who was disabled and unemployed, financially provided for the children through benefits received from governmental-assistance programs. S.H.W., who was six years old when she was removed from the mother's custody, had been diagnosed with a "speech impairment" and a learning disability. S.H.W. was receiving speech therapy and attending special-education classes to address her special needs. The mother testified that she was taking online college courses to learn more about how to address S.H.W.'s special needs. H.T., who was three years old when she was removed from the mother's custody, had been diagnosed with various dental problems for which she was regularly receiving treatment, according to the mother.

In September 2019, DHR received a report that substance abuse was occurring in the family's home. At that time, the father tested positive for methamphetamine. DHR entered into a safety plan with the mother, who had received a negative drug-test result, pursuant to which she was allowed to retain custody of the children, provided that the father was not allowed to reside in the home; the mother was also required to supervise the father's visitations with the children. According to the safety plan, the mother showed "great aptitude toward protecting her children as evidenced by her motivation to create a safe environment for her children." The mother was also "fully willing to cooperate" with DHR.

In October 2019, the mother tested positive for methamphetamine. Based on that positive drug-test result, DHR terminated the safety plan, removed the children from the mother's home, and placed the children into foster care, where they have since remained. DHR subsequently completed a child-abuse-and-neglect investigation and determined that the children were at risk of harm from the mother as a result of her positive drug-test result. The mother denied that she had ever used

illegal drugs and testified that she could not explain the positive drug-test result.

DHR immediately instituted a plan requiring the mother to submit to a substance-abuse assessment, drug testing, and substance-abuse counseling. The mother cooperated with that plan. The mother testified that she had learned a great deal about substance abuse during her counseling sessions, which she had completed in the summer of 2020. Between November 2019 and August 2021, the mother submitted to numerous drug tests and did not produce a single positive result for methamphetamine use after January 2020. At trial, the mother continued to maintain that she had never used illegal drugs and that she had never had a substance-abuse problem. A DHR social worker testified that she had no concerns that the mother was using illegal drugs.

As the case progressed, DHR shifted its focus from the mother's suspected drug abuse to concerns regarding the mother's home environment. The mother had agreed, as part of a family-reunification plan with DHR, that she would maintain stable, clean, and appropriate housing with working utilities for the children. The mobile home in

which the mother was residing at the time the children were removed from her care was described by the children's Court Appointed Special Advocates ("CASA") worker as hazardous, unsanitary, and flea infested. DHR provided the mother with intensive in-home services through programs from ECA FOCUS ("FOCUS") designed to teach her better housekeeping skills. Although the mother testified that she had benefited from those services, the CASA worker testified that she had seen no improvement in the condition of the mobile home throughout 2021 and that any efforts that the mother had made to better her housekeeping skills had proven unsuccessful. The CASA worker and a DHR social worker testified that the mother, who, despite having a learning disability, had obtained an associate's degree in "childcare/preschool" and was, at the time of the last trial date, working toward a bachelor's degree in child psychology, did not seem to understand the severity of the conditions of her residence and did not consistently apply what she had been taught to address those conditions.

In the fall of 2021, the mother moved into a newer and larger mobile home, which the mother described as being clean and in good repair with

working utilities. However, a DHR witness who had inspected that mobile home described it as being in the same or even worse condition than the original mobile home, such that DHR could not approve of the children's visiting there. According to DHR's witnesses, it seemed that the mother was permanently incapable of maintaining a safe and sanitary home, and DHR cited that problem as the main factor supporting its petition to terminate the mother's parental rights. The mother disputed that testimony and testified that, by the time of the last day of trial, the second mobile home had been renovated, repaired, and cleaned so that it was safe and suitable for the children.

While working with DHR to improve her housekeeping skills, the mother maintained regular visits with the children. At first, she visited the children for two hours every two weeks under supervision. The mother began having unsupervised visits with the children in December 2020, and, eventually, in 2021, the mother began keeping the children overnight every two weeks. The mother testified that the children were excited to visit with her and enjoyed their visits. During the visits, the mother would give the children food, clothes, and other presents, and, on

at least one occasion, money, and the mother would play games with the children to entertain them. A social worker employed by Alabama Baptist Children's Home ("ABCH") testified that the mother appeared to have benefited from the parental counseling that she had received, that the mother had been consistent with her visitations with the children, that she was attentive and had acted appropriately toward the children during visitations, and that the children "absolutely" love the mother and "[y]ou can definitely tell there is an attachment there." The children's CASA worker also testified that the mother had displayed a proper general protective capacity over the children when the CASA worker had observed them visiting at the mother's residence and that the children appeared to be happy and bonded with the mother.

Some evidence, however, indicates that the mother sometimes communicated improperly with S.H.W. during visits, that the mother appeared to have failed to give S.H.W. medication during one overnight visit, and that, on another occasion, had provided the children with food that was past its expiration date. Also, after visits, the children would often smell of cigarettes or other foul odors and would appear unclean

8

and afflicted by flea bites as a result of the condition of the mother's residence.

On June 10, 2021, the mother became involved in a domestic dispute involving a neighbor of the children's aunt. The mother testified that she was visiting the aunt when, she said, the neighbor became verbally abusive and began acting aggressively toward the aunt and the mother. The aunt called the police, which, the mother said, had ended with the neighbor, not the mother, being arrested. The mother testified that she considered herself to have been a victim in that domestic dispute. Nevertheless, DHR ceased allowing the mother to exercise unsupervised visits with the children or to communicate with them over the telephone, and DHR changed its permanency goal[2] from returning the children to the custody of the mother to adoption over the objection of the mother. All family-reunification services, except for drug testing and in-person visitations, ended at that point. The mother testified that

---

[2]As discussed infra, the term permanency, in this context, refers to a safe, stable, and nurturing custodial arrangement lasting throughout the child's minority.

9

it was her understanding that the June 10, 2021, domestic dispute had caused DHR to take the abrupt change in its course of action.

At trial, several DHR witnesses testified that, based on their visits to the mother's residence, they had developed concerns that the mother was maintaining a relationship with the father, who, they said, had consistently tested positive for illegal drugs, had refused to participate in any services offered by DHR, and had completely abandoned the children after June 2020. The mother testified that she had ended her relationship with the father in September 2019 and that, at the time of the first trial date, she had not seen him in over one year. However, the juvenile court heard evidence, although disputed by the mother, indicating that the mother had kept men's clothes and shoes in her residence, that she had corresponded with the father through social-media platforms, that she and the father had together attended supervised visits with the children in 2019 and 2020, that the father had received service of legal process at the mother's residence, and that the father had been seen mowing the mother's lawn on one occasion, all indicating that the mother and the father had remained together.

10

Additionally, the mother resided in an area owned or controlled by the father's relatives, which, according to the DHR witnesses, made her living situation unstable.

The CASA worker, the ABCH worker, and a DHR social worker all testified that the children needed a suitable permanent home apart from the mother. DHR's witnesses acknowledged that the mother had cooperated with the family-reunification process but stated that the mother had not shown sufficient and consistent improvement to the point that DHR could recommend that the children be returned to her custody. Testimony indicated that the foster parent with whom the children had primarily resided since October 2019 had provided the children with a suitable home. During their time in foster care, the children's physical, mental, dental, and educational health had significantly improved, although H.T. had been diagnosed with a speech problem for which she was receiving speech therapy. The foster parent would not agree to adopt the children, however. The DHR social worker assigned to the case at the time of the last trial date asserted that adoption would be the only option to provide the children with permanency. Upon the conclusion of

the trial, the children's guardian ad litem also recommended that the juvenile court terminate the mother's parental rights so that the children could achieve permanency through adoption. Although DHR had changed the permanency plan to adoption in June 2021, by the last day of trial on April 26, 2022, DHR had not identified an adoptive resource for the children.

<u>Standard of Review</u>

A judgment terminating parental rights must be supported by clear and convincing evidence, which is "'"[e]vidence that, when weighed against evidence in opposition, will produce in the mind of the trier of fact a firm conviction as to each essential element of the claim and a high probability as to the correctness of the conclusion."'" <u>C.O. v. Jefferson Cnty. Dep't of Hum. Res.</u>, 206 So. 3d 621, 627 (Ala. Civ. App. 2016) (quoting <u>L.M. v. D.D.F.</u>, 840 So. 2d 171, 179 (Ala. Civ. App. 2002), quoting in turn Ala. Code 1975, § 6-11-20(b)(4)).

> "'[T]he evidence necessary for appellate affirmance of a judgment based on a factual finding in the context of a case in which the ultimate standard for a factual decision by the trial court is clear and convincing evidence is evidence that a fact-finder reasonably could find to

12

> clearly and convincingly … establish the fact
> sought to be proved.'
>
> "KGS Steel[, Inc. v. McInish,] 47 So. 3d [749] at 761 [(Ala. Civ.
> App. 2006)].
>
> "… [F]or trial courts ruling … in civil cases to which a
> clear-and-convincing-evidence standard of proof applies, 'the
> judge must view the evidence presented through the prism of
> the substantive evidentiary burden[,]' [Anderson v. Liberty
> Lobby, Inc., 477 U.S. 242, 254 (1986)];; thus, the appellate
> court must also look through a prism to determine whether
> there was substantial evidence before the trial court to
> support a factual finding, based upon the trial court's
> weighing of the evidence, that would 'produce in the mind [of
> the trial court] a firm conviction as to each element of the
> claim and a high probability as to the correctness of the
> conclusion.'"

Ex parte McInish, 47 So. 3d 767, 778 (Ala. 2008). This court does not reweigh the evidence but, rather, determines whether the findings of fact made by the juvenile court are supported by evidence that the juvenile court could have found to be clear and convincing. See Ex parte T.V., 971 So. 2d 1, 9 (Ala. 2007). When those findings rest on ore tenus evidence, this court presumes their correctness. Id. We review the legal conclusions to be drawn from the evidence without a presumption of correctness. J.W. v. C.B., 68 So. 3d 878, 879 (Ala. Civ. App. 2011).

13

Issue

The mother argues on appeal that the juvenile court's conclusions in its judgments that the mother was unwilling or unable to discharge her parental responsibilities to the children and that DHR had made reasonable efforts to rehabilitate her are not supported by clear and convincing evidence; that there was insufficient evidence of the mother's current conditions to warrant the termination of her parental rights; that DHR failed to establish that there were no viable relative resources; and that the juvenile court erred in terminating her parental rights because maintenance of the status quo was a viable alternative to termination. We find the mother's last argument dispositive of these appeals.

Analysis

Section 12-15-319, Ala. Code 1975, a part of the Alabama Juvenile Justice Act ("the AJJA"), Ala. Code 1975, § 12-15-101 et seq., provides that a juvenile court may terminate the parental rights of a parent when clear and convincing evidence shows that the parent cannot or will not discharge the duty of providing his or her children with a safe, clean, and suitable home. See generally H.B. v. Mobile Cnty. Dep't of Hum. Res.,

236 So. 3d 875, 882 (Ala. Civ. App. 2017) (holding that a juvenile court may terminate parental rights when a parent, due to an uncorrectable, permanent inability or unwillingness, cannot or will not provide a home free from "chronic, recurring unsanitary conditions" that "endanger the health of the child"); L.M. v. Shelby Cnty. Dep't of Hum. Res., 86 So. 3d 377, 387 (Ala. Civ. App. 2011) (recognizing that the rights of a parent may be terminated when that parent fails or refuses to protect his or her children from threat of harm presented by the other unfit, abusive, or neglectful parent by allowing the other parent access to family home). However, because a parent has a fundamental right to the custody of his or her natural children, Santosky v. Kramer, 455 U.S. 745, 758-59, 102 (1982), due process demands that a juvenile court terminate a parent's parental rights only when some other, less-drastic measure would be unavailing, Roe v. Conn, 417 F.Supp. 769, 779 (M.D. Ala. 1976), or, as Alabama appellate courts have stated more commonly, a juvenile court may terminate a parent's parental rights only when clear and convincing evidence shows that no other viable alternative to termination exists. Ex parte Ogle, 516 So. 2d 243, 243 (Ala. 1987).

15

Termination of parental rights is the most extreme measure the state can undertake to redress parental unfitness, abuse, or neglect. See Santosky, supra; M.H. v. Cleburne Cnty. Dep't of Hum. Res., 158 So. 3d 471, 482 (Ala. Civ. App. 2014). Termination of parental rights involves the complete, permanent, and irreversible extinguishment of a parent's right to custody, control, and even association with his or her children. Id. Through termination of parental rights, a juvenile court assures that a parent has no legal means of accessing the child to expose the child to the threat of harm arising from the unhealthy parent-child relationship. See S.M.M. v. R.S.M., 83 So. 3d 572, 573 (Ala. Civ. App. 2011) ("The purpose of the statute authorizing termination of parental rights is to protect children from harm emanating from an adverse parental relationship."). But the state has other means of adequately protecting a child from the threat of parental harm, including placing the child out of the family home and in the sheltered environment of foster care with contact between the parent and the child being monitored and any personal visits being supervised. See, e.g., Ex parte T.V., supra. If that alternative is available, it would serve as a less-drastic means of securing

16

the safety and welfare of the child, militating against termination of parental rights. Id.

However, foster care is intended primarily to secure to a child a safe and nurturing home temporarily during the period in which the child's custodial parent works toward rehabilitation to the point when the family can be safely reunited. K.W. v. J.G., 856 So. 2d 859, 873 (Ala. Civ. App. 2003). The Adoption and Safe Families Act of 1997 ("the ASFA"), 42 U.S.C. §§ 671 and 675, was enacted to prevent a child from languishing in foster care after it has been determined that the goal of family reunification cannot be accomplished. See Robert M. Gordon, Drifting Through Byzantium: The Promise and Failure of the Adoption and Safe Families Act of 1997, 83 Minn. L. Rev. 637, 642 (1999). The ASFA rests on the premise that all children need "permanency" to thrive and to mature properly into responsible adults and citizens. Id. In this context, the term "permanency" refers to a safe, stable, and nurturing custodial arrangement lasting throughout the child's minority. See generally B.W.C. v. State Dep't of Hum. Res., 582 So. 2d 579, 580 (Ala. Civ. App. 1991); In re Interest of Sarah K., 258 Neb. 52, 57, 601

17

N.W.2d 780, 784 (1999) (applying federal guidelines for applying the ASFA). To obtain this goal, the ASFA requires states that receive federal funding for their foster-care programs, like Alabama, to use reasonable efforts to expeditiously move children out of foster care and into permanent homes, preferably through termination of parental rights with adoption. Ramesh Kasarabada, <u>Fostering the Human Rights of Youth in Foster Care: Defining Reasonable Efforts to Improve Consequences of Aging Out</u>, 17 CUNY L. Rev. 145, 157 (2013). Because long-term foster care does not provide children with the permanency contemplated by the ASFA, "generally speaking, maintaining a child in indefinite foster care is not a viable alternative to termination of parental rights." <u>T.L.S. v. Lauderdale Cnty. Dep't of Hum. Res.</u>, 119 So. 3d 431, 439 (Ala. Civ. App. 2013).

Our legislature has enacted various statutes to comply with the ASFA, including Ala. Code 1975, § 12-15-315, which is based on 42 U.S.C. § 675(5) (defining "case review system"). Section 12-15-315(a) requires juvenile courts to conduct a "permanency hearing" for the purpose of determining the "permanency plan" for a dependent foster child within

18

12 months of the placement of the child in foster care and at least annually thereafter. Section 12-15-315 lists various custodial arrangements a juvenile court may approve as the permanency plan for a foster child, including: adoption, relative placement, kinship guardianship, and "[a]nother planned permanent living arrangement," meaning long-term foster care. See Ex parte Bodie, [Ms. 1210248, Oct. 14, 2022] ___ So. 3d ___, ___ (Ala. 2022) (Parker, C.J., concurring specially) (citing Josh Gupta-Kagan, The New Permanency, 19 U.C. Davis J. Juv. L. & Pol'y 1, 9 n.3 (2015)). Consistent with the intention behind the ASFA to move children out of foster care, § 12-15-315(b) provides that a juvenile court shall determine that the permanency plan for a foster child shall be placement in another planned permanent living arrangement only when a "compelling reason" shows that it is not in the best interests of the child to return to his or her home or to be placed for adoption, placed with a relative, or placed in a kinship guardianship.

Section 12-15-315(b) does not set forth the compelling reasons that may justify a juvenile court leaving a child in long-term foster care rather than terminating parental rights and placing a child for adoption.

However, the caselaw from this court recognizes that, when a foster child shares a beneficial emotional bond with a parent, continued visitation with the parent serves the best interests of the child, and the prospects for the child to be adopted or placed in some permanent custodial arrangement is indefinite, speculative, or unlikely, the court should not terminate parental rights under those circumstances, but, instead, it should maintain the status quo by leaving the child in long-term foster care. See C.M. v. Tuscaloosa Cnty. Dep't of Hum. Res., 81 So. 3d 391 (Ala. Civ. App. 2011); B.A.M. v. Cullman Cnty. Dep't of Hum. Res., 150 So. 3d 782, 784-86 (Ala. Civ. App. 2014); T.N. v. Covington Cnty. Dep't of Hum. Res., 297 So. 3d 1200 (Ala. Civ. App. 2019); D.S.R. v. Lee Cnty. Dep't of Hum. Res., 348 So. 3d 1104 (Ala. Civ. App. 2021).

Recently, in his special concurrence in Ex parte Bodie, supra, Chief Justice Parker explained the primary basis for this line of cases. Because of the fundamental rights of parents to a relationship with their children, the state may not terminate parental rights except when no other less restrictive means are available to achieve its dual objectives of protecting children from parental abuse and neglect and meeting the needs of the

child for permanency. As Chief Justice Parker put it, when a child is secured from the threat of parental abuse or neglect through placement in foster care, but adoption is not a viable option, "termination is not only not the least restrictive means, it is not a means at all," ___ So. 3d at ___ (Parker, C.J., concurring specially), for providing a child with permanency. "Accordingly, to meet the no-viable-alternative element, at a minimum DHR must prove by clear and convincing evidence that adoption is a viable option ...." Id. If the state fails to carry that burden, the juvenile court cannot terminate parental rights.

The party seeking to terminate a parent's rights bears the burden of proving that the termination of those rights is the appropriate remedy. K.W. v. J.G., 856 So. 2d 859, 874 (Ala. Civ. App. 2003). In this case, DHR, as the petitioner, bore the burden of proving that termination of the mother's parental rights was the only avenue available to advance the government's compelling interest in protecting the children and meeting their need for permanency. The evidence presented by DHR showed that, at the time of trial, the children were residing with the foster parent, subject to the supervised visitation of the mother outside of her home,

and, thus, were adequately protected from the identified threats to their health, safety, and welfare from the mother's home environment or her continuing association with the father. DHR's witnesses testified that the children needed permanency and that the mother could not provide that permanency, which, according to DHR, could be achieved only through termination of parental rights with adoption. However, DHR did not present any evidence to prove that adoption was presently a viable option for the children.

The undisputed evidence in the record shows that the foster parent did not agree to adopt the children and that DHR did not identify any other adoptive resource for the children. The record does not disclose whether DHR searched for a suitable adoptive home for the children, but the record does indicate that DHR changed the permanency plan to adoption in June 2021, and the AJJA specifically states that "reasonable efforts shall be made to place the child in a timely manner in accordance with the permanency plan ... and to complete whatever steps are necessary to finalize a permanent plan for the child." Ala. Code 1975, § 12-15-312(b). Furthermore, DHR regulations explicitly allow DHR to

22

place children in a pre-adoptive foster home pending legal proceedings to terminate parental rights. See Ala. Admin. Code (Dep't of Hum. Res.), r. 660-5-22-.03(2). Thus, we can infer that DHR had made some efforts to place the children for adoption but that those efforts had not succeeded in identifying a readily available, suitable adoptive placement for the children in the 10 months since the permanency plan had been changed to adoption.

Additionally, the evidence in the record reveals that H.T. and, possibly, S.H.W., continue to have special needs that may affect their prospects for adoption. See Talladega Cnty. Dep't of Hum. Res. v. J.J., 187 So. 3d 705, 713-714 (Ala. Civ. App. 2015) (requiring juvenile courts to consider special needs of child that may impede permanency). Furthermore, under the ASFA, the state must develop a plan to use reasonable efforts to place the children together in the same adoptive home unless doing so would be contrary to their safety or welfare, see 42 U.S.C. § 671(a)(31)(A), which does not seem to be the case here. Those circumstances may adversely affect the ability of DHR to find a suitable adoptive home for the children, but no DHR witness testified about those

potential impediments to adoption or how DHR had addressed or even planned to address those issues. The children, now ages 10 and 6 years old, may well be adoptable despite those circumstances, but DHR did not present any evidence to prove their adoptability, and the juvenile court could not assume that fact, which was not proven by clear and convincing evidence.

In the final judgments, the juvenile court simply awarded DHR permanent custody of the children with "discretion in planning and placement." The judgments may have freed the children for adoption, but they do not actually achieve the goal of the ASFA to provide the children with permanency. The entire purpose of the ASFA is to remove dependent children from "foster care limbo." Kasarabada, supra, at 157. However, the judgments leave the children in foster care indefinitely, without any proven prospect for acquiring a substitute parent or parents through adoption or any other means, and, now, facing the added stressor of the permanent loss of their relationship with the mother.

Section 12-15-35, Ala. Code 1975, authorizes a juvenile court to terminate parental rights even when DHR has not identified an adoptive

resource. In <u>R.B. v. State Department of Human Resources</u>, 669 So. 2d 187 (Ala. Civ. App. 1995), this court held that a juvenile court may terminate parental rights even though the child may not be immediately adopted. In reaching that conclusion, the court reasoned that, even if an adoptive resource has not materialized, a juvenile court should be allowed to terminate parental rights in "egregious" circumstances. <u>Id.</u> In <u>R.B.</u>, this court did not specify what "egregious" circumstances would warrant the entry of a judgment terminating parental rights that leaves a child an orphan with no definite prospect of adoption or other permanent custodial arrangement, but the cases applying <u>R.B.</u> have since clarified that that drastic remedy is appropriate when maintaining any relationship with the parent would only subject the child to continuing emotional or physical harm. For example, in <u>T.L.S. v. Lauderdale County Department of Human Resources</u>, 119 So. 3d 431 (Ala. Civ. App. 2013) (authored by Moore, J., with Pittman, J., concurring, and Thompson, P.J., and Thomas, J., concurring in the result), this court affirmed a judgment terminating the parental rights of T.L.S. to her two children despite the lack of an identified adoptive

resource. The evidence in that case showed that T.L.S. had been convicted of abusing one of the children, who had since come to fear T.L.S., that the other child had resented that T.L.S. had not believed that she had been sexually abused while in the custody of T.L.S., that both children suffered from severe emotional and behavioral problems stemming from their abuse, and that the children would regress behaviorally after visiting with the mother. In cases like T.L.S., although termination of parental rights does not achieve permanency, it is justified as being the least restrictive means of accomplishing the compelling governmental interest of securing the child from parental abuse or neglect that emanates from the mere continuing existence of the parent-child relationship.

On the other hand, in Talladega County Department of Human Resources v. J.J., 187 So. 3d 705 (Ala. Civ. App. 2015), this court affirmed a judgment in which the Talladega Juvenile Court declined to terminate the parental rights of the parents of an autistic child, who had special educational and caregiving needs, due to the lack of an identified adoptive resource and the "'strong possibility of [the child at issue] being

26

a legal orphan for her life'" if parental rights were terminated. 187 So. 3d at 709. The undisputed evidence in J.J. showed that the child had been placed in a therapeutic foster home and that any adoptive resource would have to cater to the special needs of the child, including providing the child with constant supervision. The state had not identified an adoptive resource and intended only to place the child on the state adoption registry upon termination of parental rights. A witness for the state testified that the child would remain in long-term foster care if no adoptive resource was located. In addressing whether the lack of an identified adoptive resource alone was a sufficient basis for denying the petition to terminate parental rights, this court acknowledged the holding in R.B. but concluded that the Talladega Juvenile Court had not erred in considering the lack of an adoptive resource when concluding that maintaining the status quo would be a viable alternative to termination of the parents' parental rights. This court reasoned that, when the likelihood of adoption has not been proven, the state has failed to prove by clear and convincing evidence that termination of parental rights will provide the child with permanency. This court held that, in

27

such cases, the juvenile court may properly consider the fact that the termination of parental rights may not achieve "'the desire for permanency,'" 187 So. 3d at 713-14 (quoting C.M., 81 So. 3d at 398), and can leave the child in long-term foster care, if that option is available, in order to preserve a relationship between the parent and the child that will not harm the child.

As the foregoing cases illustrate, when the state fails to prove that termination of parental rights will meet its goal of providing a child with permanency, the state may justify terminating parental rights only when no other available custodial alternative will satisfactorily protect the child from parental harm. Termination of parental rights with no identified adoptive resource or other definitive prospect for permanency would be an overly broad measure when termination is unnecessary for the protection of the child. See B.A.M, 150 So. 3d at 786. In such cases, if the evidence shows that, in fact, long-term foster care is a viable alternative that accomplishes the goal of protecting the child from parental harm, a juvenile court must employ that option instead of

28

terminating parental rights to protect the constitutional rights of the parent to a relationship with his or her child.

In this case, the record shows that the juvenile court could have maintained the status quo. Although the foster parent would not agree to adopt the children, DHR did not present any evidence indicating that the foster parent would not continue to provide the same level of care to the children in which they have been thriving since October 2019. The current long-term foster-care arrangement satisfies the children's basic health and safety needs while protecting them from the identified threats to their welfare posed by the mother. The record does not disclose the availability of any other permanent custodial arrangement for the children. A judgment terminating parental rights must be based on current circumstances. See A.P. v. Covington Cnty. Dep't of Hum. Res., 293 So. 3d 892 (Ala. Civ. App. 2019). Unless and until the circumstances proven by the evidence change, long-term foster care appears to be the only current available option to advance the government's interest in the welfare of the children.

We conclude that DHR did not prove through clear and convincing evidence that termination of parental rights was the least restrictive means to protect the children from the mother or that termination of the mother's parental rights would provide permanency for the children through adoption. Because maintenance of the status quo is a viable alternative to termination of the mother's parental rights to the children in this case, as we concluded in C.M. and other similar cases, we reverse the juvenile court's judgments and remand the cases to the juvenile court for the entry of judgments consistent with this opinion.

CL-2022-0694 -- REVERSED AND REMANDED.

CL-2022-0695 -- REVERSED AND REMANDED.

Edwards, Hanson, and Fridy, JJ., concur.

Thompson, P.J., concurs in the result, with opinion.

THOMPSON, Presiding Judge, concurring in the result.

I agree that the termination of parental rights should occur only in extreme circumstances in which it is demonstrated that a parent cannot or will not be successfully reunited with his or her child. I concur in the result reached by the main opinion that, under the unique circumstances of this case, leaving these children in foster care with continued contact with the mother was a viable alternative to the termination of the mother's parental rights and was in the children's best interests. D.M.P. v. State Dep't of Hum. Res., 871 So. 2d 77, 97 (Ala. Civ. App. 2003); C.M. v. Tuscaloosa Cnty. Dep't of Hum. Res., 81 So. 3d 391, 398 (Ala. Civ. App. 2011) ("[W]e conclude that, in this exceptional case, termination of the mother's parental rights was not in the best interests of the children because of the beneficial relationship between the mother and the children."). In this case, the evidence supports the determination that allowing the children to continue to visit the mother is a viable alternative that would be beneficial to the children.

I disagree with that part of the analysis in which the main opinion, without an argument on the issue having been made by the appellant,

attempts to broaden the law concerning viable alternatives to termination. In this case, DHR failed to present any evidence regarding whether the children at issue are considered to be adoptable, i.e., whether they might be adopted in the future. I agree that, in the absence of such evidence, when the record demonstrates that, as here, the child and the parent share a strong emotional bond such that it would be beneficial to the child at issue to maintain a relationship with the parent, the parent's parental rights should not be terminated. In my opinion, however, the main opinion errs in attempting to expand the law to hold that where a strong emotional bond exists between a parent and a child, but no adoptive resource is identified at the time of the termination-of-parental-rights hearing, the juvenile court may terminate parental rights only in the most extreme or egregious cases in an attempt to achieve permanency for the child.

Each termination-of-parental-rights action concerning a child must be resolved on its own specific facts, and the broad holding of the main opinion precludes such a case-specific determination. See L.M. v. D.D.F., 840 So. 2d 171, 179 (Ala. Civ. App. 2002) ("Due to the serious nature of

32

the action of terminating a parent's parental rights, this court must carefully review the unique set of facts established in each case in determining whether clear and convincing evidence was presented to support the termination of those rights."). Not all prospective adopters are willing to come forward and expose themselves to the uncertainties inherent in the judicial process concerning the termination of a parent's parental rights to a prospective adoptee. In a case like this one involving the termination of parental rights where a strong bond between the parent and the child has been established, DHR should present evidence regarding whether adoption is a viable alternative for achieving permanency for the child. However, I see no reason, when a juvenile court is addressing whether the termination of parental rights will provide the child with permanency, to impose an additional requirement that mandates that, except in the most extreme and egregious cases, an adoptive resource must be identified at the time of the termination-of-parental-rights hearing.